2024 IL App (1st) 221562-U

No. 1-22-1562

First Division
September 30, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| | ) | Appeal from the |
| THE PEOPLE OF THE STATE OF | ) | Circuit Court of |
| ILLINOIS, | ) | Cook County. |
| | ) | |
|     Plaintiff-Appellee, | ) | |
| | ) | No. 21 CR 10721 |
|   v. | ) | |
| | ) | |
| SONNIE MARTIN, | ) | Honorable |
| | ) | Vincent M Gaughan, |
|     Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for unlawful possession of a weapon by a felon is affirmed where (1) the evidence was sufficient to prove beyond a reasonable doubt that he possessed a firearm within the meaning of the statute, (2) the trial court properly denied his motion to suppress, and (3) his as-applied constitutional challenge under the second amendment is without merit.

¶ 2    Following a bench trial, defendant-appellant Sonnie Martin was found guilty of unlawful possession of a weapon by a felon (UPWF) (720 ILCS 5/24-1.1(a) (West 2020)) and sentenced to

44 months' imprisonment. Defendant appeals therefrom, arguing that (1) there was insufficient evidence to find him guilty of UPWF beyond a reasonable doubt; (2) the trial court erred in denying his motion to suppress; (3) his conviction for UPWF violates the second amendment of the United States Constitution; and (4) his 44-month sentence was excessive.[1] For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On August 13, 2021, defendant was charged by indictment with one count of UPWF and two counts of aggravated unlawful use of a weapon based on an investigatory stop and subsequent search which took place on July 21, 2021.

¶ 5      Prior to trial, on December 7, 2021, defendant filed a motion to suppress evidence alleging that the police did not have reasonable, articulable suspicion to stop him, and therefore, the weapon seized from his person was inadmissible as evidence. A hearing was conducted contemporaneously with the trial at which the following evidence was presented.

¶ 6      Chicago police officers Cesar Cuevas and Jose Granados both testified as to the following facts. On July 21, 2021, while in their police vehicle, they received a dispatch call from the Office of Emergency Management and Communications (OEMC) at 5:49 p.m., which relayed a 911 call from an anonymous person who reported a person "flashing a gun" at the Falcon Fuel gas station located at the intersection of 79th Street and Ashland Avenue. The subject was described as a black male wearing a white T-shirt, black jeans, and orange, purple, and green shoes. After the dispatch call recording was played in court, Cuevas testified that the dispatcher did not say that the caller

---

[1] Because defendant's sentence has been discharged, he has withdrawn the issue of excessive sentence as moot. See *In re Christopher K.*, 217 Ill. 2d 348, 359 (2005) (noting that "the completion of a defendant's sentence renders a challenge to the sentence moot").

observed a person flashing a gun, how long it had been since the caller said there was a person flashing a gun, or how the caller knew there was a person flashing a gun.

¶ 7    The officers drove towards the Falcon Fuel gas station where they observed an individual matching the description in the parking lot of the gas station. The person was a black male wearing a white T-shirt, black jeans, and orange, purple, and green shoes. The officers, along with additional police officers in another police vehicle behind them, detained the person, who Cuevas and Granados identified in court as defendant. This occurred one to two minutes after receiving the dispatch call. Cuevas confirmed that, upon first seeing defendant, he was not doing anything illegal.

¶ 8    Defendant was instructed to stop and place his hands on the wall. The officers proceeded to handcuff defendant as Cuevas asked defendant if he had any weapons on his person. Defendant responded, "my protection," which Cuevas understood to mean that defendant had a weapon on him. Defendant's shirt was lifted, which revealed a weapon in his waistband. Granados recovered the weapon, and eventually defendant was placed in the other police vehicle to be transferred to the police station. Granados "cleared the weapon for any bullets and discovered one chambered bullet in the firearm." Granados testified that, based on his four years' experience as an officer and his further examination of the weapon at the police station, the weapon he recovered was a firearm. In court, Cuevas viewed the inventoried items, which he stated were "1 live round in my hand, the black steel 9-millimeter handgun and then empty magazine." In looking at the recovered weapon, he noted that it looked like the serial number had been scratched off. Cuevas further confirmed that the officers did not speak with anyone else at the gas station and did not request any security footage and that no one else at the gas station matched the 911 caller's description.

¶ 9    The recovered weapon was eventually sent to the Forensic Services Division. Both officers testified that they did not request the Forensic Sciences Division to conduct any tests or further analyze the weapon. Cuevas testified that he knew there were tests to recover scratched-off serial numbers, but Granados was not aware of those tests at the time. Both officers also testified that the recovered magazine did not fit the weapon and a part of it seemed to be missing.

¶ 10    The body-worn cameras on both Cuevas and Granados were active and functioning properly that day. Footage from both body cams was played before the court.

¶ 11    In the footage from Cuevas's body cam, the officers arrive at the gas station, immediately spot an individual matching the description, and defendant is instructed to place his hands on the wall. One of the officers then brings his hands around his back to place them in handcuffs, as another officer asks, "You got anything on you?" and defendant responds, "Yes. My protection." As they lift defendant's shirt, a weapon is visible in his waistband, which is then recovered. Cuevas walks towards Granados who states that there was one bullet in the chamber and notes that the magazine does not appear to fit the weapon. One of the other officers is heard asking defendant if he has a firearm owner's identification (FOID) card or a concealed carry license (CCL), but a response, if offered, is not audible. Cuevas then returns to the vehicle to run defendant's driver's license and Granados places the recovered items in the police vehicle. Granados states, "I don't even know what kind of gun that is." He also states, "it's a fake gun" and "it's a BB-gun." Cuevas responds, "We can figure it out at the station."

¶ 12    Granados's body cam footage reflects the same sequence of events. In particular, he is seen recovering the weapon from defendant's waistband. He pulls the magazine out and eventually removes a bullet from the chamber of the weapon. Later, after Cuevas states, "We can figure it out at the station[,]" Granados walks back towards the other police vehicle to instruct the other officers

to drive defendant to the station. He then states, "I don't think the gun is real." Chicago police officer Edwards[2] agrees, stating "That's what I thought." Granados responds, "It looks like a f*** BB-gun. I guess we'll figure it out at the station." Granados returns to his vehicle and the footage ends.

¶ 13     On cross-examination, Granados testified that the magazine did not fit neatly within the weapon which made him suspicious that it was not a real gun. He further testified that he examined the gun and "[a]t the beginning" he thought it was a BB-gun or a fake gun. He also testified that it appeared that part of the gun was wood, which he found inconsistent with other firearms. He also confirmed that there was an orange dot on the weapon, which is consistent with BB-guns. He confirmed that the reason for the orange dot was to distinguish between a real firearm and a BB-gun. He elaborated that: "At the beginning when I first started looking at it I wasn't sure until further on. I kept on looking at all the aspects making sure I had a real firearm which ended up being *** a real firearm." When asked to clarify, he stated:

"So once I took the magazine out I realized that it was a broken magazine which is a real magazine but the magazine has a spring inside. The bottom part, which was there was supposed to hold the spring which the bullets go through the top and that firearm didn't have that. *** [T]hey broke that off.

Then there is a part in the gun where there's supposed to be a serial number. That serial number was not there. It appeared to be scratched off somehow. That's how I knew it was a firearm and then in the back of the gun there's a pin which it's supposed to – when

_____

[2] Officer Edwards's first name does not appear in the record.

you hit the trigger the pin hits the bullet which makes it fire and that pistol has a pin in the back. If you look at the back of the gun[,] there is that pin right there."

¶ 14 Specifically, as to the serial number, Granados testified that "where the serial number is supposed to be[,] [t]here was one letter and there's supposed to be a number following it. There was no number there." When asked when he changed his mind that the weapon was in fact a real gun, Granados responded: "Once I got to the station and I viewed the – I had time to view the pistol because I can't really – I have to be watching my surroundings while I'm on the street especially in the area I was at."

¶ 15 After both witnesses concluded their testimony, the State sought to present a firearms expert as a witness, but the trial court denied the State's motion. The parties then stipulated that defendant had a 2017 felony conviction for delivery of a controlled substance, for which he received two years' probation.

¶ 16 The trial court first ruled on defendant's motion to suppress, finding that the officers had reasonable suspicion to stop defendant. This finding was based on the specific description given in the 911 call, defendant matching the description, and the brief time that elapsed from the dispatch call to the officers' stop. The trial court also found that the officers' detainment of defendant as well as the lifting up of his shirt were within the scope of a *Terry* stop, and once they saw the weapon, they had probable cause to arrest him.

¶ 17 As to the bench trial, the trial court found that the State had proved "each and every element" beyond a reasonable doubt for the charge of UPWF. We note that, prior to ruling, the court stated: "I don't like the idea of Officer Cuevas saying, [']We'll take care of it at the station.['] That was nonsense because nothing was taken care of."

¶ 18    Defendant filed a motion to reconsider or, alternatively, for a new trial, asserting that the State failed to prove the offense beyond a reasonable doubt and that the trial court erred in denying the motion to suppress evidence. The trial court denied this motion.

¶ 19    Following a sentencing hearing, defendant was sentenced to 44 months' imprisonment with 641 days of credit. On the same day, defendant filed a motion to reconsider the sentence, which the trial court denied.

¶ 20    This appeal followed.

¶ 21                                II. ANALYSIS

¶ 22    On appeal, defendant argues that (1) there was insufficient evidence to find him guilty of UPWF beyond a reasonable doubt; (2) the trial court erred in denying his motion to suppress; and (3) his conviction for UPWF violates the second amendment of the United States Constitution.

¶ 23                         A. Sufficiency of the Evidence

¶ 24    Defendant first contends that the evidence presented was insufficient to establish his guilt beyond a reasonable doubt. In particular, defendant argues that the State failed to prove that defendant possessed a "firearm" where the body cam video showed "the officers examining the item and stating it was a BB-gun[.]" In his reply brief, defendant further argues that "there was no evidence that Granados further examined the item at the station" and points out that the trial judge commented on the officers' failure to actually analyze the gun at the station as they insinuated they would.

¶ 25    The State responds that defendants' argument lacks merit where a live bullet was found in the chamber of the weapon and both officers identified the weapon as being a "real" nine-millimeter handgun based on their training and experience. The State also contends that the argument fails because the trial court had the opportunity to observe the gun, its magazine, and the

recovered bullet, and based on that evidence, the trial court correctly found that each element of the offense had been proved.

¶ 26    When a defendant challenges the sufficiency of the evidence against him, this court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins,* 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A reviewing court will not retry the defendant or substitute its judgment for that of the trier of fact regarding the credibility of witnesses or the weight to be given to each witness's testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). A defendant's conviction will be reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 27    The State has the burden of proving beyond a reasonable doubt each element of an offense. *People v. Gray*, 2017 IL 120958, ¶ 35. To sustain a conviction for UPWF, the evidence must establish beyond a reasonable doubt that the defendant possessed a firearm and was convicted of a prior felony. 720 ILCS 5/24-1.1(a) (West 2020). The parties stipulated to defendant's prior felony conviction, and thus, the only element at issue before this court is whether defendant possessed a firearm.

¶ 28    The FOID Act defines a "firearm" as any device "designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas[.]" 430 ILCS 65/1.1. (West 2020). Additionally, to qualify as a firearm under the statute, the device cannot fall into one of four exceptions: BB-guns, paintball guns, flare guns, or certain antique firearms. *Id.*

¶ 29    It is well established that the positive and credible testimony of a single witness is sufficient to sustain a conviction. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). In particular, "courts have consistently held that eyewitness testimony that the offender possessed a firearm, combined with circumstances under which the witness was able to view the weapon, is sufficient to allow a reasonable inference that the weapon was actually a firearm." *People v. Jackson*, 2016 IL App (1st) 141448, ¶ 15. Additionally, video evidence showing a defendant with a gun has been sufficient to prove the defendant possessed a firearm. *People v. Collins*, 2021 IL App (1st) 180768, ¶ 54. "[T]he question of whether eyewitness testimony is sufficient to establish that an object is a 'firearm' is a question of fact properly determined by the [trier of fact]." *People v. Clark*, 2015 IL App (3d) 140036, ¶ 24.

¶ 30    In this case, the record shows that both police officers viewed the recovered weapon during the bench trial and testified that it was a real firearm. See *People v. McLaurin*, 2020 IL 124563, ¶ 36 (a trained and experienced police officer with an unobstructed view provided sufficient evidence to establish the defendant was armed with a firearm); *People v. Wilson*, 2020 IL App (1st) 170443, ¶ 22 (relying on *McLaurin* and finding that a single officer's eyewitness testimony was sufficient to prove that the gun met the statutory definition of a firearm). Further, a 9-millimeter live round was found in the chamber of the firearm, which also supported the finding that the recovered weapon was a firearm and not a BB-gun. Although both officers acknowledged at trial that the gun was initially suspected to be fake or a BB-gun, they later determined that it was a firearm as defined in the FOID Act. Contrary to defendant's assertion, Granados specifically testified that he further examined the firearm at the station "where he had time to view the pistol" and he explained precisely what led him to believe upon further examination that it was a "real" firearm. Additionally, there were no inconsistencies in the officers' testimony, and thus, their

testimony remained unimpeached. In any case, this court cannot substitute its judgment for that of the trier of fact regarding witness credibility. As such, we conclude that the trial court's finding that all elements of the offense were met was supported by sufficient evidence.

¶ 31    Nonetheless, defendant asserts that, because Granados initially commented that the gun might not be real or might be a BB gun, his testimony identifying the weapon as a real firearm should be discounted and is not sufficient to sustain his conviction. Citing *People v. Malone*, 2012 IL App (1st) 110517, defendant specifically contends that, as there was some contrary evidence that the weapon was a fake gun or a BB-gun, the trial court could not have properly found that it was a firearm as defined in the FOID Act.

¶ 32    In *Malone*, the defendant was convicted of armed robbery following a bench trial. *Id.* ¶ 1. On appeal, the defendant argued that there was no evidence that the item in his hand met the statutory definition of a firearm where the gun was never recovered and there was no detailed description of the gun. *Id.* ¶ 41. The record showed that the victim testified that she saw the defendant holding a gun and stated "I seen [*sic*] a whole gun. It was rested on the [counter], his hand was on it, it was black." *Id.* ¶ 51. In concluding that there was sufficient evidence for a rational trier of fact to find that defendant was armed with a gun that met the statutory definition of a firearm, the court stated that "[t]here was no contrary evidence presented that the gun was a toy gun, a BB gun, or anything other than a 'real' gun." *Id.* ¶ 52. The court based its conclusion on the victim's "unequivocal testimony and the circumstances under which she viewed the gun, coupled with the videotape of the offense and still photograph[.]" *Id.*

¶ 33    Defendant misreads *Malone* and improperly broadens its import to effectively conclude that any contrary evidence that the gun was anything other than a real firearm would result in insufficient evidence to prove that element. The fact that there is conflicting evidence does not

render it insufficient for conviction. Rather, even where there is conflicting evidence presented at trial, the trier of fact is free to weigh the evidence, determine the credibility of witnesses, and come to any rational conclusion as to the sufficiency of the evidence. See *People v. Ross*, 229 Ill. 2d 255, 272 (2008). The trial court, as the trier of fact in a bench trial, did just that in this case.

¶ 34 Additionally, defendant's argument that Granados's testimony should be discounted in its entirety based on his statements at the scene is effectively a request for this court to second-guess the trier of fact's weighing of the evidence. As we have already made clear, to reweigh the evidence would usurp the role of the trier of fact. See *McLaurin*, 2020 IL 124563, ¶ 22 (The reviewing court "will not retry the defendant, nor will we substitute our judgment for that of the trier of fact.").

¶ 35 Even accepting defendant's seeming invitation to us to reweigh the evidence, his insufficiency argument would nonetheless fail. Although Granados did state at the scene that the gun was either fake or a BB-gun, he testified consistently at trial that, after examining the weapon in greater detail and with better focus at the station, his opinion changed and he determined that it was, in fact, a real firearm. While viewing the weapon in court, he provided the following reasons to support his determination: the gun's serial number had been scratched off; the gun had a pin in it, which is consistent with real firearms; and the magazine did not fit in the gun simply because it was broken. We acknowledge, as did the trial court, Granados's initial uncertainty regarding the weapon while at the scene. Clearly the trial court was aware of and considered Granados's initial speculation and the officers' failure to submit the firearm for further analysis but ultimately decided that the officers' testimony was sufficiently credible to find that defendant possessed a firearm as contemplated in the FOID Act. In so finding, the court relied on Granados's testimony that he investigated the firearm further and determined it was a firearm, as well as Cuevas's testimony that the weapon was a 9-millimeter handgun. Our reviewing courts have declined to

"establish a minimum requirement" for proving that a defendant possessed an actual firearm (*Jackson*, 2016 IL App (1st) 141448, ¶ 17), and therefore, under the applicable standard of review, we cannot say that the trial court's conclusion based on the officers' testimony at trial was unreasonable.

¶ 36    Defendant also relies on *People v. Ross*, 229 Ill. 2d 255, 277 (2008), for support. In *Ross*, the defendant was convicted of armed robbery. Evidence at trial was to the effect that the arresting officer drove the robbery victim back to the scene of the offense and the victim pointed out the defendant, who was then arrested. *Id.* at 258. As the officer approached the defendant, he observed him throw something into a bush. *Id.* A gun was retrieved from the bush, but it was not offered into evidence at trial. *Id.* However, the officer described it as a " '4.5 BB caliber gun with a three inch barrel.' " *Id.* The inventory sheet in the record listed the gun consistently with the officer's testimony. *Id.* The victim described the gun as " 'a black, very portable gun.' " On appeal, the supreme court concluded that the evidence was insufficient to support the trier of fact's inference that the "gun" the defendant possessed constituted a dangerous weapon. *Id.* at 277. This conclusion was based on the evidence that the gun was in fact a small BB gun and the lack of evidence regarding whether it was loaded, whether it was brandished as a bludgeon, or regarding its weight or composition. *Id.*

¶ 37    This case is distinct from *Ross* in the obvious fact that the officers in this case, although originally speculating that the weapon was a BB gun or a fake gun, both testified at trial that it was a "real" firearm. In *Ross*, there was no dispute that the weapon was, in fact, a BB gun. *Id.* at 258. Moreover, the issue in *Ross* was markedly different where the trier of fact was deciding whether a small BB gun could be considered a dangerous weapon under the armed robbery statute, not whether the weapon could be considered a firearm under the FOID Act.

¶ 38    Rather, the State offers *People v. McLaurin*, 2020 IL 124563, as instructive, and we agree. In that case, a police officer, who was about 50 feet away, observed the defendant leave the building she was surveilling " 'carrying a silver handgun' " and leaving the area in a white van. *Id.* ¶ 4. The officer followed the van, which was quickly stopped by other police officers. *Id.* After the occupants, which included the defendant and two other individuals, exited the van, a handgun was recovered from underneath the van near the door from which the defendant exited. At trial, the officer described the item recovered as " 'the same color [and] size of the handgun I saw the gentleman enter the van with.' " *Id.* ¶¶ 5-8. The officer further testified that she had 12 years of experience as a police officer and was familiar with handguns. *Id.* ¶ 6. The gun was not offered into evidence at trial, and it was not tested for fingerprints. *Id.* ¶¶ 8-9. The appellate court reversed the defendant's conviction for being an armed habitual criminal, reasoning that, in the case of possessory firearm offenses, the item possessed cannot be inferred to be a firearm from circumstantial evidence. *Id.* ¶ 17.

¶ 39    Our supreme court reversed this court and concluded that a rational trier of fact could infer from the testimony presented *** that [the] defendant possessed a firearm" as defined by the statute. *Id.* ¶ 35. This conclusion was based on the clear and unimpeached testimony of the officer who first observed the gun and another officer's testimony that the recovered weapon matched the description and was fully loaded and had to be unloaded when it was recovered. *Id.* ¶¶ 36-37.

¶ 40    Although there were no initial speculations in *McLaurin* regarding the weapon's authenticity, we nonetheless find *McLaurin* helpful. Notwithstanding Granados's statements, greater evidence was presented at trial that the recovered weapon was a firearm. Unlike *McLaurin*, here, the recovered weapon was presented in court, along with a live round found in the weapon's chamber; the testifying officers viewed the weapon during the bench trial; and Granados

specifically offered several reasons as to why he later determined at the police station that the firearm was not a BB gun or a fake gun but was, in fact, a real gun. Additionally, in reversing the appellate court, the supreme court in *McLaurin* rejected the notion that there must be some direct or physical evidence proving that an item is a "real" firearm. This supports our earlier point that there is no minimum evidentiary requirement for firearms identification, and thus, the trial court here was free to conclude, based on the evidence presented, that the firearm fell within the statutory definition, even without a firearms expert or forensic analysis.

¶ 41 Because the credible testimony of experienced police officers can support a finding that a weapon is a firearm as defined by statute, we do not find the trial court's finding that defendant possessed a firearm so unreasonable, improbable, or unsatisfactory that there is a reasonable doubt as to defendant's guilt. See *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). Accordingly, viewing the evidence in the light most favorable to the State, as we must, we conclude that there was sufficient evidence to support defendant's conviction for UPWF.

¶ 42                                   B. Motion to Suppress

¶ 43 Next, defendant argues that the trial court erred in denying his motion to suppress because the officers relied solely on an anonymous tip and lacked reasonable suspicion or probable cause to stop, search, and arrest defendant. Defendant relies on *Florida v. J.L.*, 529 U.S. 266 (2000), as well as *People v. Holmes*, 2019 IL App (1st) 160987, for support of his argument.

¶ 44 In response, the State contends that the stop of defendant was permissible as it was predicated on reasonable suspicion created by the anonymous 911 call that provided a detailed description of the suspect. For support, the State cites *People v. Carter*, 2021 IL 125954, where our supreme court recently assessed a stop based on an anonymous 911 call. The State also asserts that the officers had valid probable cause to arrest defendant based on the weapon recovered from

his person. For the reasons that follow, we agree with the State and conclude that the trial court properly denied the motion to suppress.

¶ 45    The standard for reviewing a trial court's ruling on a motion to suppress is twofold. First, the trial court's factual findings and credibility determinations are subject to the manifest weight of the evidence standard. *People v. Jones*, 215 Ill. 2d 261, 268 (2005). A finding is against the manifest weight " 'only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence.' " *People v. Daniel*, 2013 IL App (1st) 111876, ¶ 21 (quoting *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995)). This deferential standard is based on the supposition that the trial court is in "a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." *Jones*, 215 Ill. 2d at 268. Second, the trial court's ultimate legal ruling, *i.e.* whether the evidence should be suppressed, is reviewed *de novo*. *Id.*

¶ 46    The fourth amendment to the United States Constitution provides the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., amend. IV. The reasonableness requirement of the fourth amendment generally requires a warrant supported by probable cause. *Jones*, 215 Ill. 2d at 269. "Probable cause exists where the facts and circumstances, considered as a whole, are sufficient to justify a belief by a reasonably cautious person that the defendant is or has been involved in a crime." *People v. Thornton*, 2020 IL App (1st) 170753, ¶ 25.

¶ 47    An exception to the warrant requirement exists where officers conduct an investigatory stop, also known as a *Terry* stop, based on reasonable suspicion that a crime has been or is about to be committed. *People v. Sims*, 2014 IL App (1st) 121306, ¶ 8; see *Terry v. Ohio*, 392 U.S. 1 (1968) (setting forth the principles for determining the reasonableness of a temporary investigative

stop). An officer may make an investigatory stop of any person if he or she "reasonably infers from the circumstances that the person is committing, is about to commit or has committed" a criminal offense. 725 ILCS 5/107-14(a) (West 2020). The relevant question is whether the facts available to the officer would warrant a person of reasonable caution to believe that the action taken was appropriate. *People v. Houlihan*, 167 Ill. App. 3d 638, 642 (1988). This analysis necessitates a balance of the need for the seizure against the invasion that the seizure entails. *Terry*, 392 U.S. at 21.

¶ 48    Further, "reasonable suspicion is a less exacting standard than probable cause," and an investigatory stop may be justified even "when no violation of the law is witnessed, so long as it does not constitute a mere hunch." *Thornton*, 2020 IL App (1st) 170753, ¶ 26. An officer "must point to specific, articulable facts that, taken together with rational inferences, reasonably warrant the intrusion." *Id.* As relevant here, where the investigatory stop is based on information from a third party, the tip must be reliable and allow "an officer to reasonably infer that a specific person was involved in criminal activity." *People v. Jackson*, 348 Ill. App. 3d 719, 729 (2004). In assessing the reliability of a tip, the court must consider whether the officers' observations corroborate the tip, whether the informant explains the basis for his knowledge of the tip, and the duration of time between receiving the tip and acting upon it. *People v. Lampitok*, 207 Ill. 2d 231, 257 (2003).

¶ 49    Here, the State satisfied its burden of establishing that the officers' investigatory stop was appropriate based on the information available to them at that time. Both officers testified that they received a dispatch call relaying a 911 call that a person was "flashing a gun" at a gas station and this person was wearing a white T-shirt, black pants, and orange, green, and purple sneakers. This dispatch call was included in the record and played during the bench trial. Although the officers

presumed that the report was based on the 911 caller's personal observation, the call did not explicitly make that clear. Less than two minutes after the dispatch call, the officers arrived at the gas station and immediately observed defendant who precisely matched the description and, according to Cuevas, no one else at the gas station matched the description. The body cam footage also showed that defendant matched the description including the distinctively colored sneakers. This observation of a person matching the description corroborated the 911 call and from that an inference of credibility was warranted. *Thornton*, 2020 IL App (1st) 170753, ¶ 30; see also *People v. Shafer*, 372 Ill. App. 3d 1044, 1050 (2007) (citing numerous cases and noting that 911 calls are not truly anonymous because the caller can be identified and subjected to criminal charges if a false report has been made).

¶ 50    The officers then detained defendant and, based on the information gleaned from the 911 call, they began handcuffing him and asked if he had anything on his person. Under these circumstances, the handcuffing was reasonable as the officers already reasonably suspected, based on the 911 call and defendant's matching description, that he was armed with a weapon. See *Colyar*, 2013 IL 111835 (handcuffing a person does not necessarily convert a *Terry* stop into an arrest). When defendant responded that he had his protection, which Cuevas understood to mean a weapon, the officers lifted his shirt, revealing a gun in his waistband. See *People v. Flowers*, 179 Ill. 2d 257, 266 (1997) ("A weapons frisk is valid only when the officer has reason to believe that a particular individual is armed and dangerous."); see also *People v. Bujdud*, 177 Ill. App. 3d 396, 403 (1988) (Police officers "are not required to risk their safety by assuming that a suspect will submit peacefully to questioning."). Based on this, the trial court determined that the investigatory stop was proper, and there is nothing in the record that persuades us that an opposite conclusion was apparent or that the court's decision was arbitrary or unreasonable. See *People v. Ross*, 317

Ill. App. 3d 26, 31 (2000) (the scope of the investigation must be reasonably related to the circumstances that justified the police interference and the investigation must last no longer than necessary to effectuate the purpose of the stop); see also *Hayes v. Florida*, 470 U.S. 811, 816 (1985) (noting, if articulable facts support a reasonable suspicion that a person has committed a criminal offense, police may stop the person to identify him, question him briefly, or detain him briefly while attempting to obtain additional information).

¶ 51 In coming to this conclusion, we have considered the cases upon which each party relies for support of their respective positions as to the reliability of the 911 call.

¶ 52 We begin with defendant's request that we follow the decision of *Florida v. J.L.*, 529 U.S. 266 (2000), to conclude that the 911 call here did not provide the officers with reasonable suspicion to justify the investigatory stop. In *J.L.*, an anonymous caller reported to the police that a young black male wearing a plaid shirt was standing at a bus stop carrying a gun. *Id.* at 268. No audio recording of the tip was provided, and nothing was known about the caller. *Id.* It was also unknown how much time after receiving the call officers were instructed to respond. *Id.* When the officers arrived at the bus stop, they observed an individual matching the description, and although the defendant did not make any furtive movements and did not visibly appear to have a gun, the officers detained him, frisked him, and seized a gun from his pocket. *Id.*

¶ 53 The Supreme Court held that the anonymous tip by itself was insufficient to justify the *Terry* stop. *Id.* at 272. In determining that the tip did not give rise to reasonable suspicion, the Court specified its deficiencies: there was no predictive information, the informant was unaccountable, and the informant did not explain how he had obtained this information regarding a concealed weapon. The Court thus reasoned that an anonymous tip must be reliable in "its

tendency to identify a determinate person" and "its assertion of illegality" and those requirements were not satisfied in the case before it. *Id.* at 272.

¶ 54    In contrast to *J.L.*, the tip here was slightly more specific in its description of the person including both the color of the person's pants and the distinctive coloring of his sneakers and the tip was corroborated where a person matching the description was observed only one to two minutes after the dispatch call. Additionally, the use of the emergency system for the anonymous caller in this case is a significant distinction from the call made in *J.L.*

¶ 55    Finally, there was an assertion of suspected illegality in the call here that was not present in *J.L.* Here, the caller stated that the person was "flashing a gun" at the gas station. The applicable definitions of "flash" in this context are: "to make known or cause to appear with great speed," "to display obtrusively and ostentatiously," or "to expose to view usually suddenly and briefly[.]" Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/flash (last visited September 9, 2024). The fact that the caller used the word "flashing" suggests that the person was doing so repeatedly or consistently, and it is significant that the person was doing this in a public place. Even if the person had both a FOID card and a CCL, exposing the handgun in public would constitute a violation of the Concealed Carry Act (430 ILCS 66 *et seq.* (West 2020)). See *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 37 (individuals are implicitly prohibited from carrying fully exposed handguns in view of the public). From the foregoing, it would be reasonable to infer that (1) the caller personally observed this behavior and, (2) the person "flashing a gun" is not a law-abiding citizen in lawful possession of a firearm. See *Terry*, 392 U.S. at 30 (stating a reasonable suspicion of criminal activity may arise from "unusual conduct" that may lead an officer to believe "criminal activity may be afoot"). In contrast, the caller in *J.L.* merely stated the person at the bus stop was in possession of a gun. Thus, it was unclear how a bystander could have

knowledge of a concealed weapon and there was no report of conduct that suggested illegal activity. For these reasons, we find *J.L.* distinguishable.

¶ 56 Defendant also relies on *People v. Holmes*, 2019 IL App (1st) 160987. There, a different panel of this district found that an "effectively anonymous" tip "did not support a finding of reasonable suspicion" and "reverse[d] the trial court's denial of [the defendant's] motion to suppress." *Id.* ¶ 18. The tip in *Holmes* came from a Chicago Park District security guard who informed a Chicago police sergeant that a man, "described as black, about five-and-a-half feet tall, wearing a purple shirt and black jeans" was in the park with a gun in his pocket. *Id.* ¶ 1. That sergeant then relayed this information to two Chicago police officers, who found someone matching that description within two to three minutes. *Id.* Those officers conducted a *Terry* stop and frisk on the defendant and recovered a firearm. *Id.* ¶ 2.

¶ 57 The tip in *Holmes* has one significant commonality with the tip in *J.L.*, which is that the tipster did not provide any basis for their knowledge that a weapon was concealed on either of the respective defendants. That commonality is not present here where the 911 caller specifically stated that the individual was "flashing a gun" outside of a gas station and the dispatch call also relayed that same phrasing to the responding officers in this case. Certainly, this does not constitute demonstrative proof of illegality. See *People v. Jenkins*, 2021 IL App (1st) 200458, ¶ 47 (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)) (Reasonable suspicion does not require police to " 'rule out the possibility of innocent conduct.' "). However, it is more sufficient than the mere statements in *Holmes* and *J.L.* of a person in possession of a gun without explaining how the tipster knew that information and how that conduct implicated potential criminal activity.

¶ 58 The State relies, instead, on *People v. Carter*, 2021 IL 125954, a recent case in which our supreme court assessed the reliability of an anonymous tip. There, officers received a dispatch,

like here, from the OEMC stating that an anonymous caller reported that a white male wearing a black jacket and hooded sweatshirt was "swinging" at two females and that he had a gun on him. *Id.* ¶ 4. The caller identified the intersection at which the group was located. *Id.* Police arrived at the intersection two or three minutes after receiving the dispatch but did not see anyone matching the individuals described. *Id.* ¶ 5. Another dispatch call came through, relaying additional information from the caller that the group was walking two blocks north of the intersection. *Id.* The officers relocated to that area within two to four minutes and observed a white male matching the caller's description, who was holding the right side of his waistband. *Id.* The two women were not seen nearby, and the testifying officer did not see the defendant violate any laws. *Id.* The officer detained the defendant, and based on the call and his own observations, he patted down the defendant for his own safety and recovered a revolver from his waistband. *Id.* ¶ 7. The circuit court denied his motion to suppress, and this court affirmed. *Id.* ¶ 1.

¶ 59    Our supreme court agreed, holding that the officers had the necessary reasonable suspicion for an investigatory stop. *Id.* ¶ 25. Relying on *Navarette v. California*, 572 U.S. 393 (2014), the court noted three indicia of reliability for anonymous tips: when the caller claims eyewitness knowledge of criminal activity; when the time between the suspected criminal activity and the officers' response is brief; and when the caller uses the 911 emergency system to make their report. *Id.* ¶ 26. The court found each of these present in the case before it where the tip was made through the 911 system; it was a reasonable inference that the tipster observed the suspected criminal activity firsthand as the tipster gave updated information through a second call; and the information was relayed shortly after it was observed. *Id.* ¶ 27. The court further pointed to the officer's corroboration of the tip where he saw someone matching the description and he observed what appeared to be an attempted concealment of a firearm. *Id.* ¶ 28.

¶ 60    Additionally, the court rejected an attempt to analogize the defendant's case to that of *J.L.* *Id.* ¶ 31. The court pointed out several distinctions between the case before it and the facts in *J.L.*: (1) the officer personally observed conduct that led him to believe that the defendant was concealing a firearm; (2) the tip came through the 911 system; (3) the tipster seemed to have firsthand knowledge of the suspected criminal activity; and (4) the tip involved more than just the possession of a firearm as the tipster also stated that the individual was "swinging at" two females. *Id.* As we have explained above, we find the facts before us provide greater indicia of reliability than those in *J.L.* Indeed, our facts share more commonalities with *Carter* because the tip came through the 911 system, it involved more than just possession of a firearm where the caller stated the person had been "flashing a gun" at the gas station, and that statement suggested that the caller personally observed the flashing of the weapon, even though not stated explicitly.

¶ 61    We also find *Navarette*, to which the State also cites, instructive. The 911 caller in *Navarette* reported that another driver ran her off the road and she identified the make, model, license plate number, the mile marker, and the direction of travel. *Id.* at 395-97. The police found the matching car and pulled the defendant over about 15 minutes later. *Id.* at 396-97. The Supreme Court found the 911 call there distinguishable from the unknown tip in *J.L.* In contrast to *J.L.*, the caller had firsthand knowledge of the criminal activity, the officers' observation of the car only a brief time later suggested the caller's reliability, and the caller exposed herself to identification and accountability by using the 911 system. *Id.* at 399-401. Nonetheless, the Court admitted that it was a "close case." *Id.* at 404. For the same reasons stated in regards to *Carter*, we find *Navarette* sufficiently analogous. Although we may consider this to also be a "close case," it is not so close that an opposite conclusion is apparent.

¶ 62    Defendant also argues that "predictive information" is required, but we are unaware of, and defendant fails to point us to, a case stating that predictive information is a mandatory requirement for anonymous tips. Rather, it seems clear from *Navarette* and *Carter* that it is but one among several indicia of reliability. As our supreme court stated in *Lampitok*, 207 Ill. 2d at 258: "[D]eficiency or uncertainty in the reliability of the informant can be compensated for by a strong level of detail and corroboration of the content of the tip, and vice versa." Accordingly, courts must weigh a number of factors and the absence or presence of one is not necessarily determinative of the outcome.

¶ 63    Finally, we agree with defendant's assertion that 911 calls are not *per se* reliable, and we do not believe that *Navarette* or *Carter* stand for the proposition that they are. Rather, 911 calls merely have a stronger indicia of reliability as compared to unknown calls made outside the emergency system because they are not traceable and do not carry the possibility of penalty if determined to be a false report. See *Carter*, 2021 IL 125954, ¶ 26 (quoting *Navarette* and explaining why 911 calls have a greater indicator of veracity). But, this is just one indicator of reliability. In addition, here, the caller identified activity that could reasonably be suspected as criminal where the person was "flashing a gun"; the description of the person was sufficiently specific, particularly with the distinctive coloring of the sneakers; the description was corroborated where the only person to match the description was defendant; and the officers acted upon the dispatch call and identified the person matching the description in less than two minutes. We acknowledge that it is not certain whether the 911 caller personally observed the suspicious activity, but we do not consider this one factor to be determinative in this instance where other factors weigh in favor of reliability. Thus, under our standard of review here, we cannot say that the court's determination that the call was reliable was against the manifest weight of the evidence.

¶ 64 Defendant also argues that, because the officer initially believed the weapon to be a BB-gun, the officers could not have had a reasonable belief that defendant had committed a crime and therefore the officers lacked probable cause to arrest him. However, this argument does not comport with Illinois courts' functional application of probable cause, which "does not require a law enforcement officer to ' "know" that certain items are contraband or evidence of a crime.' " *Jones*, 215 Ill. 2d at 277.

¶ 65 "Probable cause is a fluid concept that turns on the assessment of probabilities in particular factual contexts; it is not readily, or usefully reduced to a neat set of legal rules." *Id.* at 274. It " 'does not demand any showing that [a reasonable belief] be correct or more likely true than false.' " *Id.* at 277 (quoting *Texas v. Brown*, 460 U.S. 730, 741-42 (1983) (plurality op.)). At the time of the arrest, the officers believed that defendant had engaged in criminal activity by exposing a firearm in public, the officers did not find a FOID card or CCL in defendant's wallet, defendant did not inform them that he possessed either, and the officers were not certain as to what type of firearm had been recovered. These facts and circumstances, considered as a whole, are sufficient to justify a belief that defendant had committed a crime. See *Thornton*, 2020 IL App (1st) 170753, ¶ 25; see also *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 30 ("[T]he existence of a possible innocent explanation *** did not necessarily negate probable cause."). Thus, the officers had probable cause to effectuate an arrest. See *People v. Hopkins*, 235 Ill. 2d 453, 472 (2009) (probable cause rests on "commonsense considerations, and the calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt").

¶ 66 Accordingly, we conclude that the trial court did not err in denying defendant's motion to suppress the evidence recovered during the officers' stop and search of defendant.

¶ 67                                   C. Constitutional Challenge

¶ 68    Defendant also argues that his conviction for UPWF violates the second amendment of the Constitution as applied to him. He offers as support the United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). In particular, defendant argues that the Illinois statute for UPWF is unconstitutional as applied to him because there is "no historical tradition of prohibiting non-violent persons like [him] from possessing firearms."

¶ 69    We first address the State's contention that defendant's as-applied challenge is forfeited because it was raised for the first time here on appeal. Generally, the failure to raise an issue in the trial court results in forfeiture of the issue in the reviewing court. *People v. Rodriguez*, 2021 IL App (1st) 200173, ¶ 58. Facial constitutional challenges may be raised at any time; however, as-applied constitutional challenges cannot. See *People v. Thompson*, 2015 IL 118151, ¶¶ 32-37. A facial challenge alleges that the statute is unconstitutional under any set of facts, but an as-applied challenge alleges only that the statute violates the constitution as applied to the particular set of facts and circumstances of the case at bar. *Id.* ¶ 36. Because as-applied challenges are dependent on the particular facts of the individual, "it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *Id.* ¶ 37. However, where "[a]ll facts and circumstances to decide the defendant's claim *** are already in the record[,]" the claim may be raised and reviewed on appeal for the first time. *People v. Holman*, 2017 IL 120655, ¶ 32, *overruled on other grounds by People v. Wilson*, 2023 IL 127666, ¶ 42; see also *People v. Martin*, 2018 IL App (1st) 152249, ¶¶ 12-13; but see *People v. Baker*, 2023 IL App (1st) 220328, ¶ 35 n. 11 (stating that *Thompson* is "completely inapposite because it concerns the special rules governing a section 2-1401 petition").

¶ 70    The State asserts that the record in this case does not contain all the facts and circumstances necessary to decide defendant's constitutional challenge. According to the State, defendant's

second amendment claim turns on whether he is a non-violent felon or was simply carrying the firearm for his protection; and these issues were not litigated below. We disagree with the State. The record contains defendant's criminal history, and it is unclear from the State's brief precisely what information it would have presented were this issue litigated below. We therefore consider the merits of defendant's as-applied challenge on appeal. See *People v. Brooks*, 2023 IL App (1st) 200435, ¶¶ 59-62 (explaining that the evidentiary record below was sufficiently developed and the State failed to identify any relevant omitted facts that could have been produced below).

¶ 71    That said, as we explain below, we find that defendant's as-applied constitutional challenge fails.

¶ 72    The second amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Here, the statute under which defendant was convicted provides that it is a felony to "knowingly possess on or about [one's] person or on [one's] land or in [one's] own abode or fixed place of business any *** firearm *** if the person has been convicted of a felony under the laws of this State or any other jurisdiction." 720 ILCS 5/24-1.1(a). According to defendant, under *Bruen*, "Illinois laws criminalizing the possession of firearms by all felons cannot be constitutional in all applications." The State responds that "defendant misreads both *Bruen* and the Second Amendment as conferring an unqualified entitlement to possess firearms without restriction."

¶ 73    Prior to *Bruen*, a two-part test was utilized for evaluating the constitutionality of a firearm regulation under the second amendment in accordance with *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). In *Bruen*, the Court was tasked with determining the constitutionality of New York's firearm licensing regime, which required applicants to establish that "proper cause" existed for licensure. *Bruen*, 597 U.S. at 12.

The Court ultimately held that the regime was unconstitutional, reasoning that the "proper cause" requirement allowed the government too much discretion to deny a license to an applicant seeking to possess a firearm out of a generalized desire for self-defense. *Id.* at 70. In so concluding, the Court held that the test used since *Heller* was "one step too many" and rejected any means-end analysis in the context of the second amendment. *Id.* at 19, 24. Instead, the Court insisted upon a test where the "plain text" and history would be the sole considerations. *Id.* at 24. At the first step, an individual's conduct is presumptively protected by the constitution if the conduct is covered by the second amendment's plain text. *Id.* Second, if the individual's conduct is covered by the second amendment, then "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

¶ 74    With respect to the *Bruen* test, defendant asks that this court follow the reasoning of *Brooks*, 2023 IL App (1st) 200435, for the first step of the *Bruen* test. There, the defendant was convicted of being an armed habitual criminal and his prior qualifying felony convictions included manufacture or delivery of narcotics and unlawful possession of a weapon by a felon. *Id.* ¶¶ 1, 3. On appeal, the defendant argued that the armed habitual criminal statute violated the second amendment as applied to him. *Id.* ¶ 55. As to the first step, the court first determined that the plain text of the second amendment protects a person's right to keep and bear arms and thus the defendant's possession of a firearm was " 'presumptively constitutional.' " *Id.* ¶ 89 (quoting *Bruen*, 597 U.S. at 17-18). The court noted that, at the first step, the defendant's status as a felon was "irrelevant" to the analysis. *Id.*

¶ 75    As of this writing, only two cases have agreed with *Brooks'* reasoning for the first step of the *Bruen* test, *i.e.* that felons are included in the plain text of the second amendment. See *People v. Travis*, 2024 IL App (3d) 230113, ¶ 26 (adopting the reasoning of *Brooks* in finding that "the

second amendment's plain language does not exclude felons"); *People v. Sherrod*, 2024 IL App (3d) 230275-U, ¶ 8 (following *Travis*). Other than *Brooks*, *Travis* and *Sherrod*, the jurisprudence in this court, in cases involving both facial and as-applied constitutional challenges, is that felons are excluded from the plain text of the second amendment and thus the *Bruen* test does not apply. See *People v. Thomas*, 2024 IL App (4th) 240315-U, ¶ 23 (following the majority of cases in finding that *Bruen* does not apply to convicted felons); *People v. McNeal*, 2024 IL App (1st) 231051-U, ¶¶ 20-21 (finding the defendant's facial constitutional challenge to the armed habitual criminal statute failed because *Bruen* does not apply to laws regulating firearm possession by felons); *People v. Gardner*, 2024 IL App (4th) 230443, ¶ 68 (finding that *Bruen* does not apply to felons); *People v. Burns*, 2024 IL App (4th) 230428, ¶ 21 (finding the second amendment only protects law-abiding citizens and therefore *Bruen* did not apply to the defendant's facial constitutional challenge to the UPWF statute); *People v. Carldwell*, 2024 IL App (1st) 230968-U, ¶¶ 21-22 (declining to follow *Brooks* and instead finding that *Bruen* did not apply to the defendant's as-applied constitutional challenge to UPWF statute); *People v. Wright*, 2024 IL App (1st) 230428-U, ¶¶ 16-17 (declining to follow *Brooks* and finding that the defendant's facial challenge to the UPWF statute failed); *People v. Kelley*, 2024 IL App (1st) 230569, ¶ 16 (finding that *Bruen* did not indicate an intent to expand the second amendment's protection to those who are not law-abiding citizens); *People v. Gross*, 2024 IL App (2d) 230017-U, ¶ 24 (finding that the second amendment's language protects only law-abiding citizens); *People v. Echols*, 2024 IL App (2d) 220281-U, ¶¶ 152-53 (finding that *Bruen* did not apply to the defendant's as-applied constitutional challenge to the UPWF statute); *People v. Boyce*, 2023 IL App (1st) 220328, ¶ 37 (finding the *Bruen* test only applies to law-abiding citizens, not felons); *People v. Baker*, 2023 IL App (1st) 220328, ¶¶ 37-39 (finding *Bruen* did not apply to the defendant's as-applied

constitutional challenge under the second amendment of the unlawful use of a weapon by a felon statute).

¶ 76    Cases rejecting *Brooks* first reason that the *Bruen* Court made clear that its test did not apply to felons where the Court's holding was limited to "law-abiding citizens," a point repeated in the opinion no fewer than 18 times. See generally *Bruen*, 597 U.S. 1 (the six justices in the majority repeated the phrase "law-abiding" 18 times in their majority opinion and concurrences); see also *Echols*, 2024 IL App (2d) 220281-U, ¶ 153 (collecting federal district court cases finding that the implication of *Bruen* is that the second amendment is limited to law-abiding citizens). Further, in his concurring opinion in *Bruen*, Justice Kavanaugh quoted *Heller*, stating: " '[N]othing in our opinion should be taken as to cast doubt on longstanding prohibitions on the possession of firearms by felons ***.' " *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*, 554 U.S. at 626-27)). This same position was endorsed in Justice Alito's concurrence, wherein he stated that *Bruen* does not "disturb[ ] anything that we said in *Heller* or *McDonald* *** about restrictions that may be imposed on the possession of carrying guns." *Bruen*, 597 U.S. 72 (Alito, J., concurring). By this, Justice Alito alludes to a footnote in *Heller* where the Court referred to prohibitions on the possession of firearms by felons as "presumptively lawful regulatory measures[.]" *Heller*, 554 U.S. at 627 n.26; see also *McDonald*, 561 U.S. at 786 (reiterating that *Heller* "did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons" (internal quotation marks omitted)). Finally, we point out that the Supreme Court's recent decision in *United States v. Rahimi*, confirmed once again that "prohibitions *** on the possession of firearms by 'felons and the mentally ill' are 'presumptively lawful.' " *Rahimi*, 602 U.S. ___, ___, 144 S. Ct. 1889, 1902 (2024) (quoting *Heller*, 554 U.S. at 626 n.26). Based on the foregoing, we find that *Bruen* does not apply to defendant, as

he is a convicted felon and not a law-abiding citizen. See *Baker*, 2023 IL App (1st) 220328, ¶ 37 ("*Bruen* just does not apply" to those who are not law-abiding).

¶ 77 Further, any attempts by the defendants in recent cases to cast the language in *Heller* and *Bruen* as nonprecedential *dicta*—which defendant also argues in this case—have been found unpersuasive. See *Burns*, 2024 IL App (4th) 230428, ¶ 19; *Kelley*, 2024 IL App (1st) 230569, ¶ 18; *Echols*, 2024 IL App (2d) 220281-U, ¶ 154; *Gross*, 2024 IL App (2d) 230017-U, ¶ 22. Either the language has not been considered *dicta* pursuant to the Eleventh Circuit Court of Appeals' decision in *United States v. Rozier*, 598 F.3d 768, 770-71 n.6 (11th Cir. 2010), which rejected such a proposition as to *Heller*'s text, or it is considered judicial *dicta* from the Supreme Court and should be afforded considerable weight in the lower courts, pursuant to *People v. Montgomery*, 2016 IL App (1st) 142143, ¶ 14 (following the *dicta* set forth in *Heller* and *McDonald*). We agree that the language in the foregoing Supreme Court cases should be followed because "[e]ven *obiter dictum* of a court of last resort can be tantamount to a decision and therefore binding in the absence of a contrary decision of that court." *Cates v. Cates*, 156 Ill. 2d 76, 80 (1993); see also *Gross*, 2024 IL App (2d) 230017-U, ¶ 22 (stating it will heed the Supreme Court's statement regarding firearms prohibitions for felons even if *dicta*). Accordingly, as we concluded in our recent decision in *Kelley*, "[w]e presume that the Supreme Court's inclusion of 'law-abiding' in the holding is not superfluous or irrelevant, especially given the Court's repeated use of the phrase throughout the *Bruen* opinion, as well as its prior decisions." *Kelley*, 2024 IL App (1st) 230569, ¶ 16; see also *Boyce*, 2023 IL App (4th) 221113-U, ¶ 15 ("[T]he Court's language in *Bruen* supports the validity of its *dictum* in *Heller*.").

¶ 78 Even were we to find that the *Bruen* test applies to felons like defendant, we would nonetheless find that defendant's as-applied constitutional challenge to the UPWF statute fails at

the second step. Defendant argues that there is no historical basis for prohibiting a person like him from exercising his second amendment right based on a prior non-violent drug conviction. However, thus far, no case from this court has concluded that prohibition on firearms possession for felons is unconstitutional as applied to nonviolent felons, and defendant has failed to convince us to be the first. As we explain below, we conclude that the UPWF statute passes constitutional muster as applied to defendant.

¶ 79     In *Echols* and *Gross*, the Second District rejected this same argument for two reasons. First, the court in both cases pointed out that the Supreme Court did not place any qualifiers on the term "felons" or make any distinction between violent and non-violent felons in either *Heller* or *McDonald*. *Echols*, 2024 IL App (2d) 220281-U, ¶ 156; *Gross*, 2024 IL App (2d) 230017-U, ¶ 27; see also *Medina v. Whitaker*, 913 F. 3d 152, 159 (D.C. Cir 2019) (observing that "[f]elonies encompass a wide variety of non-violent offenses, and we see no reason to think that the [United States Supreme Court] meant 'dangerous individuals' when it used the word felon" in *Heller*). Second, the court in both cases agreed with the *Brooks* court's conclusion that there was a sufficient historical tradition to support our legislature's prohibition of firearm possession by convicted felons. *Echols*, 2024 IL App (2d) 220281-U, ¶ 156; *Gross*, 2024 IL App (2d) 230017-U, ¶ 27.

¶ 80     Turning to *Brooks*, we note that defendant disagrees with the *Brooks* court's conclusion as to the historical analysis and argues that the court failed to cite "any law from around the time the Second Amendment was adopted that permanently disqualified felons from possessing firearms[.]" We reject defendant's invitation to depart from *Brooks* as to the second step of the *Bruen* test.

¶ 81 At the second step, the court reviewed the historical record of restrictions for possession of firearms. *Brooks*, 2023 IL App (1st) 200435, ¶¶ 91-98.[3] The court then concluded that "such categorical restrictions [were] inextricably linked to the notion of 'law abiding citizens.' " *Id.* ¶ 92. In particular, the court found that there was "widespread acceptance of the legislatures' authority to disarm felons" during the founders' era and the "majority of legal historians" agreed that the right to bear arms "turned on one's law-abiding character." *Id.* ¶¶ 96, 98. Additionally, the court specifically addressed the minority view "that traditionally regulation of firearms possession was an effort to address a risk of dangerousness *** such that it would not apply to the defendant as a nonviolent felon[.]" *Id.* ¶ 101. The court found that there was no historical requirement that an individual be deemed dangerous before prohibiting his or her from possessing a firearm and the more recent legislative history supported the same conclusion. *Id.* ¶¶ 102-104. Ultimately, the court held that the armed habitual criminal statute was "consistent with the national historical tradition of firearm regulation" and, therefore, was constitutional as applied to the defendant. *Id.* ¶ 105.

¶ 82 We do not find defendant's argument that the court failed to cite "any law from around the time the Second Amendment was adopted that permanently disqualified felons from possessing firearms" persuasive. The Supreme Court in *Rahimi* reiterated that the legislative precursors to a challenged regulation need not be a " 'dead ringer' "; rather, they must only be considered " 'analogous enough to pass constitutional muster.' " *Rahimi*, 602 U.S. at , 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 30). Moreover, the *Rahimi* Court explained that its recent second

_____

[3] The court also reviewed Supreme Court precedent on the prohibition of firearm possession for felons, particularly the Supreme Court's reliance on the phrase "law-abiding citizens." *Id.* ¶ 99. This is the same precedent discussed and relied upon for the first step of the *Bruen* test; however, the *Brooks* court utilizes that same rationale only in the second step. See *infra* ¶¶ 76-79.

amendment precedents "were not meant to suggest a law trapped in amber" and the second amendment "permits more than just those regulations identical to ones that could be found in 1791." *Id.* at ___, 144 S. Ct. at 1897-98. In accordance with the Supreme Court's requirements, the *Brooks* court aptly traced the historical roots of prohibitions on firearm possession for felons back to the Founding Era and found sufficient support for firearms restrictions for felons, such as the armed habitual criminal statute at issue there and the UPWF statute before us.

¶ 83    Accordingly, of our own volition, we find no reason to depart from the well-reasoned decisions set forth above, and defendant has not convinced us that there is any reason to do so. Thus, we conclude that the UPWF statute satisfies the second step under *Bruen*. Specifically, we agree that, historically, legislatures have categorically banned individuals from possession of firearms based on lawfulness, a felon's dangerousness has not been a consideration in prohibiting the felon from possessing a firearm, and the Supreme Court has also made no such distinction in implicitly approving bans on firearms possession for felons. As such, defendant's nonviolent criminal history does not affect the constitutionality of the UPWF statute and thus the statute is constitutional as applied to defendant. See also *People v. Linzy*, 2024 IL App (1st) 221921-U (following *Brooks* in concluding that the UPWF statute was constitutional as applied to the defendant).

¶ 84                                  III. CONCLUSION

¶ 85    For the reasons stated, we affirm the judgment of the circuit court.

¶ 86    Affirmed.