2024 IL App (1st) 230569

THIRD DIVISION
June 12, 2024

No. 1-23-0569

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CR 12886 |
| | ) | |
| JEREMAINE KELLEY, | ) | Honorable |
| | ) | Michael R. Clancy, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAN TINE delivered the judgment of the court, with opinion.
Justice D.B. Walker concurred in the judgment and opinion.
Presiding Justice Reyes specially concurred, with opinion.

**OPINION**

¶ 1                                    BACKGROUND

¶ 2     Following a bench trial, defendant Jeremaine Kelley was convicted of being an armed habitual criminal (AHC) (720 ILCS 5/24-1.7 (West 2020)). On appeal, Kelley argues that we must reverse his AHC conviction because the AHC statute is unconstitutional under the second amendment to the United States Constitution (U.S. Const., amend. II) and article I, section 22, of the Illinois Constitution (Ill. Const. 1970, art. I, § 22). For the following reasons, we affirm.

¶ 3                                    FACTS

¶ 4    At trial, the State adduced the following evidence through its sole witness, Chicago police officer Zachary Kuta. In the early morning hours of August 29, 2020, Kuta and his partner Matt Krzeptowski were on patrol near 2107 West Randolph Street in Chicago, Illinois. Kuta testified that he had patrolled this area before and knew that it was "a well-known narcotic and gang loitering area for the Black Disciples street gang." Shortly after 2 a.m., Kuta observed a group of people drinking in a nearby park and alley. Kuta and Krzeptowski approached the group in their police vehicle. Kuta observed an individual, later identified as Kelley, turn toward the police vehicle and make eye contact with him. Kuta noticed Kelley grab his waistband area and then walk north toward Randolph Street. Kuta exited the police vehicle and began following Kelley, keeping about 15 to 20 feet distance. Kuta testified that there were no obstructions that prevented him from seeing Kelley under the artificial lights. Kuta then observed Kelley turn his head and body toward him, which allowed Kuta to see Kelley's waistband. Kelley removed a dark L-shaped firearm from his waistband and placed it behind the front passenger tire of a vehicle. Kuta then jogged toward Kelley, passing the vehicle. Upon reaching Kelley, Kuta waited for his partner to arrive and placed Kelley in handcuffs. Kuta then recovered the firearm, which he believed to be loaded, from beneath the vehicle. Later, Kuta learned through a Law Enforcement Agencies Data System (LEADS) check that Kelley (1) did not possess a firearm owner's identification (FOID) card, (2) was a convicted felon, and (3) was on parole.[1]

---

[1]LEADS is a "statewide, computerized telecommunications system designed to provide services, information, and capabilities to the law enforcement and criminal justice community in *** Illinois." 20 Ill. Adm. Code 1240.10 (1999).

¶ 5    At the time of the arrest, Kelley was on parole for a 2019 conviction for manufacture and delivery of a controlled substance. He had never been issued a FOID card or a concealed carry license. Prior to the AHC conviction at issue here, Kelley had been convicted of numerous felonies, most of them within the past two decades. In 2017, he was convicted of a Class 4 felony under section 6-303 of the Illinois Vehicle Code (625 ILCS 5/6-303 (West 2016)) and received a one-year sentence in the Illinois Department of Corrections.[2] In 2013, he was convicted of retail theft and received probation. In 2012, he was convicted of three felonies: (1) aggravated battery (great bodily harm), (2) resisting a peace officer, and (3) cannabis possession. He was sentenced to two years' imprisonment. In 2002, he was convicted of possessing a stolen motor vehicle and sentenced to three years' imprisonment. Additionally, Kelley has seven misdemeanor convictions, including two DUIs and two domestic batteries.

¶ 6    In this case, the State charged Kelley with unlawful use or possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2020)), aggravated unlawful use of a weapon (*id.* § 24-1.6(a)(2)), and being an armed habitual criminal (*id.* § 24-1.7). On March 16, 2022, the circuit court held a bench trial in which it found Kelley guilty on all counts, but the court merged them into a single AHC conviction. On November 4, 2022, Kelley petitioned the court for relief from judgment under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2022)), arguing his conviction must be voided as it was premised on three unconstitutional statutes. The court denied this petition, holding that the challenged statutes are not facially unconstitutional. Kelley appeals.

¶ 7                                      ANALYSIS

---

[2]It is unclear from the record precisely for which felony under section 6-303 Kelley received his conviction.

¶ 8    On appeal, Kelley does not dispute that his conduct satisfied the elements of the AHC statute; rather, he argues that we should reverse his AHC conviction because the AHC statute is facially unconstitutional under the second amendment to the United States Constitution, and both facially and as-applied unconstitutional under article I, section 22, of the Illinois Constitution.[3]

¶ 9    The AHC statute provides:

> "(a) A person commits the offense of being an armed habitual criminal if he or she receives, sells, possesses, or transfers any firearm after having been convicted a total of 2 or more times of any combination of the following offenses:
>
> (1) a forcible felony as defined in Section 2-8 of this Code;
>
> (2) unlawful use of a weapon by a felon; aggravated unlawful use of a weapon; aggravated discharge of a firearm; vehicular hijacking; aggravated vehicular hijacking; aggravated battery of a child as described in Section 12-4.3 or subdivision (b)(1) of Section 12-3.05; intimidation; aggravated intimidation; gunrunning; home invasion; or aggravated battery with a firearm as described in Section 12-4.2 or subdivision (e)(1), (e)(2), (e)(3), or (e)(4) of Section 12-3.05; or
>
> (3) any violation of the Illinois Controlled Substances Act or the Cannabis Control Act that is punishable as a Class 3 felony or higher.
>
> (b) Sentence. Being an armed habitual criminal is a Class X felony." 720 ILCS 5/24-1.7 (West 2020).

---

[3]Kelley has omitted article I, section 22, of the Illinois Constitution under the "statutes and rules involved" portion of his brief. It should have been included pursuant to Illinois Supreme Court Rule 341(h)(5) (eff. Oct. 1, 2020), which requires appellants to include the relevant "constitutional provision *** with a citation of the place where it may be found."

¶ 10　The second amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II.

¶ 11　Article I, section 22, of the Illinois Constitution provides: "Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed." Ill. Const. 1970, art. I, § 22.

¶ 12　Here, we are tasked with determining whether the AHC statute conflicts with the federal and state constitutions. We presume that a statute is constitutional, and "we have the duty to construe statutes so as to uphold their constitutionality if there is any reasonable way to do so." *People v. Jones*, 223 Ill. 2d 569, 595-96 (2006) (citing *Arangold Corp. v. Zehnder*, 187 Ill. 2d 341, 351 (1999), and *People v. Inghram*, 118 Ill. 2d 140, 146 (1987)). A facial challenge requires a showing that the statute in question is unconstitutional under any set of facts. *People v. Thompson*, 2015 IL 118151, ¶ 36. The burden on the challenger is "particularly heavy when *** a facial constitutional challenge is presented." *Bartlow v. Costigan*, 2014 IL 115152, ¶ 18. "[A]n as-applied challenge requires a showing that the statute is unconstitutional as it applies to the specific facts and circumstances of the challenging party." *People v. Harris*, 2018 IL 121932, ¶ 38 (citing *People ex rel. Hartrich v. 2010 Harley-Davidson*, 2018 IL 121636, ¶ 12). A constitutional challenge to a statute presents a question of law, which we review *de novo*. *People v. Madrigal*, 241 Ill. 2d 463, 466 (2011). *De novo* review means we engage in the same analysis as the trial court. *Xuedong Pan v. King*, 2022 IL App (1st) 211482, ¶ 16. We begin with our consideration of the AHC statute's constitutionality under the second amendment to the United States Constitution.

¶ 13　　　　　　　　　　*The United States Constitution*

¶ 14 Kelley relies primarily on *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), to support his argument that the AHC statute is unconstitutional under the second amendment to the United States Constitution. The United States Supreme Court has expounded the second amendment on numerous occasions, most recently in its landmark decision in *Bruen*. *Bruen* involved a challenge to a New York licensing regime that regulated firearm possession. *Id.* at 8-11. Persons wishing to possess a firearm at home were required to convince a licensing officer that they were of good moral character and did not have a history of crime or mental disease and that no good cause for denial existed. *Id.* at 12. However, persons wishing to carry a firearm *outside* of their home had to show "proper cause" to be issued a license. (Internal quotation marks omitted.) *Id.* This generally meant that people had to " 'demonstrate a special need for self-protection distinguishable from that of the general community.' " *Id.* (quoting *In re Klenosky*, 428 N.Y.S.2d 256, 257 (App. Div. 1980)). The Supreme Court held that the proper cause requirement violated the constitutional right to keep and bear arms. *Id.* at 70-71. In reaching that conclusion, the Supreme Court engaged in a historical analysis to determine whether the licensing regime passed constitutional muster and clarified that the relevant test "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 26.

¶ 15 Relying on the test announced in *Bruen*, Kelley argues that because the State "cannot show, under what is now its burden, any historical analogue for such a categorical and permanent ban that carries sever [*sic*] criminal penalties," we should find that the AHC statute violates the second amendment on its face.

¶ 16 In this case, we need not conduct an historical analysis, as the Supreme Court has stated that only "ordinary, law-abiding citizens have a *** right to carry handguns publicly for their self-

6

defense." *Id.* at 9-10. In Justice Clarence Thomas's majority opinion, the phrase "law-abiding" appears no fewer than 13 times. Notwithstanding the Court's repeated use of this phrase, Kelley claims it is unimportant and irrelevant, as it merely describes the petitioners in that case, who happened to be law-abiding. This argument is unpersuasive. At the outset of *Bruen*, the Court noted that "[i]n *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. Chicago*, 561 U.S. 742 (2010), [it] recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *Id.* at 8-9. This recognition is obviously not limited to the petitioners in *Bruen* who happened to be law-abiding; rather, it reiterates the holding of its two prior second amendment decisions that limited the right to bear arms to law-abiding citizens. It does not indicate any intent to expand the protection to citizens who are not law-abiding. Moreover, the explicit holding of *Bruen* is that "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 71. By its plain language, the holding applies to law-abiding citizens. We presume that the Supreme Court's inclusion of "law-abiding" in the holding is not superfluous or irrelevant, especially given the Court's repeated use of the phrase throughout the *Bruen* opinion, as well as its prior decisions.

¶ 17    Though the *Bruen* Court did not define "law-abiding citizen," previous Supreme Court precedent identifies categories of people who have long been lawfully prevented from bearing arms. In *District of Columbia v. Heller*, the Supreme Court cautioned that

"nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing

conditions and qualifications on the commercial sale of arms." *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008).

There is little to expound here: by its plain language, the Supreme Court explicitly sanctioned the prohibition on the possession of firearms by felons. However, Kelley argues that this constitutes *dictum* and should therefore be given little or no weight. While the court's clarification in *Heller* may be considered *dictum*, we decline to disregard it.

¶ 18 The term "*dictum*" is an abbreviation of *obiter dictum*, which refers to remarks or opinions "uttered by the way." *Cates v. Cates*, 156 Ill. 2d 76, 80 (1993). Generally, *dictum* is not binding as authority or precedent. *Id.* (citing *Board of Trustees of the Police Pension Fund of Urbana v. Illinois Human Rights Comm'n*, 141 Ill. App. 3d 447, 456 (1986)). However, "an expression of opinion upon a point in a case argued by counsel and deliberately passed upon by the court, though not essential to the disposition of the cause, if *dictum*, is a judicial *dictum*." *Id.* A judicial *dictum* is "entitled to much weight, and should be followed unless found to be erroneous." *Id.* "Even *obiter dictum* of a court of last resort can be tantamount to a decision and therefore binding in the absence of a contrary decision of that court." *Id.* The Supreme Court is obviously *the* court of last resort, and Kelley has not cited a single decision stating anything contrary to what the Court stated in *Heller*. Kelley has not pointed to a single decision suggesting that prohibitions on firearm possession by felons are impermissible, so there is no reason to discount the weight of the Supreme Court's *dictum* from the *Heller* decision.

¶ 19 Additionally, the issue of whether felons could be lawfully prevented from possessing firearms was simply not before the *Heller* court. It is inappropriate for a court to consider an issue not before it. See, *e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) ("[F]ederal courts

do not issue advisory opinions."). What is not improper is for a court to indicate it would likely continue to adhere to longstanding precedent prohibiting felons' possession of arms, as it did here.

¶ 20    Moreover, even though we find it unnecessary to engage in a fulsome historical analysis, we recognize that the State has cited ample authority from around the country demonstrating a longstanding tradition of prohibiting felons from possessing firearms. See, *e.g.*, *United States v. Emerson*, 270 F.3d 203, 226 n.21 (5th Cir. 2001) (listing scholarly literature on historical firearm regulation indicating a longstanding tradition of prohibiting felons from possessing arms); *United States v. Dixon*, No. 22 CR 140, 2023 WL 2664076, at *4-5 (N.D. Ill. Mar. 28, 2023) (discussing historical precedent for prohibiting felons from possessing firearms); *United States v. Rowson*, 652 F. Supp. 3d 436, 460-62 (S.D.N.Y. 2023) (noting that post-*Bruen* federal court decisions have uniformly upheld the constitutionality of the federal statute that bans felons from possessing firearms "based on the statute's historical antecedents").

¶ 21    Kelley takes issue with all these cases, and attempts to distinguish them. However, we are not persuaded by his analysis. For instance, Kelley argues that the State's reliance on *Emerson* is unpersuasive because that case provided only a cursory overview of firearm regulation, and did so only in a footnote. We do not believe that the placement of scholarly literature on firearm regulation in a footnote somehow lessens its value or findings. The various law review articles cited in the *Emerson* footnote demonstrate that the founders did not consider felons within the common law right to bear arms, nor did the founders intend to confer such a right upon them. Kelley also challenges the State's reliance on *Dixon*, arguing that its holding applies only to violent felons. That is, only violent felons' arms rights can be abrogated. Even if *Dixon* applies only to violent felons, Kelley falls squarely within that description: he was convicted of a felony of aggravated battery involving great bodily harm. From what we can discern from the report of

proceedings, that conviction is based on Kelley stabbing another person with a knife. His prior domestic battery misdemeanor convictions are further testament to his violent nature.

¶ 22    In sum, *Bruen* is clear that second amendment rights apply to law-abiding citizens for self-defense. Accordingly, Illinois is at liberty to restrict felons' rights to bear arms.

¶ 23                                    *The Illinois Constitution*

¶ 24    Kelley argues that even if we hold that the AHC statute comports with the federal constitution, we must hold it unconstitutional on its face and as applied to Kelley under the Illinois Constitution. Kelley asserts that the "substantive analysis under both constitutional provisions is the same." Kelley then contends that the Illinois Constitution's arms provision protects a broader set of people (to include felons) than the federal constitution because it uses the phrase "individual citizen" instead of "the people." This argument is meritless.

¶ 25    In *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483, 491 (1984), our supreme court recognized that "[section 22] does not mirror the second amendment to the Federal Constitution (U.S. Const., amend. II); rather it adds the words '[s]ubject only to the police power,' omits prefatory language concerning the importance of a militia, and substitutes 'the individual citizen' for 'the people.' " The Bill of Rights Committee's majority report (Committee Report) clarifies that "the latter two changes were intended to broaden the scope of the right to arms from a collective one applicable only to weapons traditionally used by a regulated militia *** to an individual right covering a wider variety of arms." *Id.* (citing 6 Record of Proceedings, Sixth Illinois Constitutional Convention 87 (report of Bill of Rights Committee) (hereinafter Proceedings)). Nothing in the Committee Report, however, suggests that these changes were intended to protect a convicted felon's right to bear arms. To the contrary, " '[b]ecause arms pose an extraordinary threat to the safety and good order of society, the possession and use of arms is

subject to an extraordinary degree of control under the police power.' " *Id.* at 491-92 (quoting Proceedings 88). The extraordinary degree of control has long included "prohibitions on the possession of firearms by felons." (Internal quotation marks omitted.) See, *e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010); *Heller*, 554 U.S. at 626-27.

¶ 26    In *Kalodimos*, our supreme court held that the right to bear arms was not a fundamental right and therefore applied a rational basis test to determine whether a municipality's ordinance banning operable handguns passed constitutional muster. *Kalodimos*, 103 Ill. 2d at 508-09. Since then, the United States Supreme Court has held that the right to bear arms for self-defense *is* a fundamental right applicable to the states through the fourteenth amendment to the United States Constitution. *McDonald*, 561 U.S. at 791. Though *McDonald* overruled the *Kalodimos* court's holding that the right to bear arms is not fundamental without explicitly saying so, nothing in that case nor in the Supreme Court's subsequent second amendment jurisprudence suggests that the right is unlimited or absolute: " '[L]ike most rights, the right secured by the Second Amendment is not unlimited.' " *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 626).[4] Moreover, nothing in Illinois's post-*McDonald* jurisprudence suggests any departure from the long-established principle that the state's police power includes the ability to control who may bear arms. To the contrary, less than three years ago, our supreme court unanimously reaffirmed that the right to bear arms extends to law-abiding citizens for self-defense purposes. *Guns Save Life, Inc. v. Ali*, 2021 IL 126014, ¶ 28. Accordingly, Kelley's facial challenge fails.

¶ 27    Kelley's as-applied challenge is equally meritless. The crux of Kelley's argument on this point is that there is no historical precedent for a permanent status-based revocation of gun rights.

---

[4]The *McDonald* Court cited the *Kalodimos* case but did not explicitly overrule it. *McDonald*, 561 U.S. at 786.

He takes issue with the idea that past crimes may be used to determine whether an individual continues to enjoy the right to bear arms. But in Kelley's case, it was not only his felon status but also his conduct that resulted in the revocation of his gun rights. What Kelley ignores is the fact that he was still serving the sentence from his 2019 conviction for manufacture and delivery of a controlled substance. That is, he was still on parole at the time he was arrested in this case. It can hardly be said that his right to bear arms was abrogated based on something he did in the distant past: he was still serving his sentence. Moreover, by definition, he was not abiding by the law at the time of this arrest, as Illinois law mandates possession of a valid FOID card and concealed carry license, neither of which Kelley *ever* had, let alone at the time of the arrest. Finally, as detailed above, he has a long criminal history of violent and nonviolent felony and misdemeanor offenses.

¶ 28    Based on the foregoing, it is impossible to say that Kelley is a law-abiding citizen under any conceivable definition of the phrase. Accordingly, the Illinois legislature is well within its power to restrict his access to firearms.

¶ 29                                    CONCLUSION

¶ 30    Contrary to Kelley's assertions, nothing in the *Bruen* decision nor its analysis suggests that second amendment rights must extend to felons. Rather, *Bruen* explicitly recognized— repeatedly—that the right to bear arms applies only to law-abiding citizens and only for self-defense. We find nothing in the *Bruen* decision to support a holding that Illinois's AHC statute, which prohibits felons from bearing arms, fails to pass constitutional muster. Similarly, nothing in article I, section 22, of the Illinois Constitution suggests that the right to bear arms is unlimited and bars the State from prohibiting felons from bearing arms. Accordingly, we hold that the AHC

statute is constitutional under both the second amendment to the United States Constitution and article I, section 22, of the Illinois Constitution.

¶ 31   Because the AHC statute is constitutional, we affirm Kelley's AHC conviction.

¶ 32   Affirmed.

¶ 33   PRESIDING JUSTICE REYES, specially concurring:

¶ 34   I write separately as I am growing concerned regarding our court's practice of employing a "law-abiding citizen" threshold inquiry. See *supra* ¶ 16. Such approach—which bypasses the text-and-history test (see *supra* ¶ 14)—may not have been contemplated by the United States Supreme Court majority decision in *Bruen*. See *People v. Brooks*, 2023 IL App (1st) 200435, ¶¶ 88-89 (concluding that the State's contention that a convicted felon is not a "law-abiding citizen"—and he thus "falls outside the scope of 'the people' that have the right 'to keep and bear arms,' " as provided in the second amendment—"incorrectly conflates *Bruen*'s first step with its second"); see also *United States v. Duarte*, 101 F.4th 657, 670 (9th Cir. 2024) (stating that "we do not think that the Supreme Court, without any textual or historical analysis of the Second Amendment, intended to decide the constitutional fate of so large a population in so few words and with such little guidance"). Even assuming that such approach is consistent with *Bruen*, the precise meaning and scope of the term "law-abiding" is unclear. *E.g.*, *People v. Mobley*, 2023 IL App (1st) 221264, ¶ 30 (employing the "law-abiding citizen" approach but noting that "[w]hether a defendant who is not a violent offender can demonstrate that he or she is a law-abiding citizen *** is an issue for another case").

¶ 35   Notwithstanding the foregoing, I agree with the majority that the State has demonstrated that the AHC statute is consistent with the nation's historical tradition of firearm regulation (see *supra* ¶ 20) and thus defendant's conviction should be affirmed.

***People v. Kelley*, 2024 IL App (1st) 230569**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-CR-12886; the Hon. Michael R. Clancy, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and S. Amanda Ingram, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Brian Levitsky, and Sara McGann, Assistant State's Attorneys, of counsel), for the People. |