NOTICE
Decision filed 04/22/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240751-U

NO. 5-24-0751

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Pope County. |
| | ) | |
| v. | ) | No. 23-CF-6 |
| | ) | |
| MICHAEL J. ROBBINS, | ) | Honorable |
| | ) | Carey C. Gill, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HACKETT* delivered the judgment of the court.
Justices Barberis and Sholar** concurred in the judgment.

**ORDER**

¶ 1     *Held*: The defendant failed to establish that the unlawful possession of a weapon by a felon statute was unconstitutional, either facially or as applied to him, under the second amendment of the United States Constitution.

¶ 2     Following a jury trial in the circuit court of Pope County, the defendant, Michael J. Robbins, was found guilty of unlawful possession of a weapon by a felon (UPWF) (720 ILCS 5/24-1.1(a) (West 2022)) and sentenced to 10 years in prison. On appeal, he contends that (1) the State failed to prove him guilty beyond a reasonable doubt and (2) the UPWF statute was

---

*Justice Welch was originally assigned to the panel prior to his death. Justice Hackett was substituted on the panel and has read the briefs.
**Justice Moore was originally assigned to the panel prior to his retirement. Justice Sholar was substituted on the panel and has read the briefs.

1

unconstitutional, either facially or as applied to him, under the second amendment of the United States Constitution (U.S. Const., amend. II). For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On April 18, 2023, the State charged the defendant with one count of aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)), one count of aggravated unlawful use of a weapon (*id.* § 24-1.6(a)(1), (a)(3)), and one count of UPWF (*id.* § 24-1.1(a)). On August 7, 2023, the defendant moved to sever the UPWF charge from the other two charges. That same day, the trial court granted the defendant's motion to sever. The subject of this appeal is the prosecution of the UPWF charge.

¶ 5      On August 14, 2023, the defendant's jury trial commenced. After opening statements, the trial court read the following stipulation to the jury: "[T]he defendant, Michael J. Robbins, has been convicted of a felony." The following testimony was then presented. Ronald Trammel testified that on April 15, 2023, he was sitting inside his vehicle at the end of his driveway when he observed the defendant driving past his house in a green Geo Tracker. The defendant was dating Trammel's daughter, and Trammel did not like the defendant. Trammel called Sheriff Jerry Suits to report that the defendant was driving without a valid driver's license, so he could get the defendant in trouble. After the defendant drove past Trammel's house, Trammel started following the defendant because Trammel was going to his friend's house in that direction. Trammel was driving a white 2000 Dodge Dakota truck. He was driving right behind the defendant and was trying to pass, but the defendant kept "brake checking" him by suddenly hitting the brakes, forcing Trammel to brake to avoid a collision.

¶ 6      Trammel noted that this continued for approximately one-half of a mile until they were in front of Michael Walker's house where there was water covering part of the road. Trammel was related to Walker through Trammel's wife. At this point, the defendant moved over to the left side

of the road to avoid the water, and Trammel drove through the water on the right and passed the defendant on that side. Trammel observed that Mike Bates was sitting in the passenger seat of the defendant's vehicle. After passing the defendant, Trammel heard a gunshot behind him. He noted that he was familiar with firearms, and he had no doubt that the sound that he heard was a gunshot. He did not see where the gunshot came from and did not look behind him after hearing the gunshot. However, other than the defendant's vehicle, there were no other vehicles behind him. Trammel then parked his vehicle in a parking lot behind an old grocery store. The defendant followed and parked nearby. Treva Beavers, Trammel's neighbor, also arrived and parked in the parking lot.

¶ 7    The defendant then exited his vehicle and had "words with" Beavers. Trammel approached them, but he did not get involved in their conversation. Once Beavers left, the defendant returned to his vehicle and started to leave. However, Trammel started yelling at the defendant, and the defendant got back out of his vehicle and approached Trammel. As they briefly exchanged words, the defendant took off his shirt and "got in [Trammel's] face." Their altercation never became physical, and once it was over, the defendant returned to his vehicle and left. Trammel never saw a weapon on the defendant or a weapon in the defendant's vehicle. Trammel had contacted Sheriff Suits a second time when he heard the gunshot. On cross-examination, Trammel acknowledged that he was aggressively driving behind the defendant, that he did not like the defendant, and that he still wanted the defendant to get in trouble. On redirect examination, Trammel noted that although Beavers was his neighbor, they were not friends, and he had only interacted with her once or twice before this incident.

¶ 8    Beavers testified that she was standing outside the Walkers' residence with her daughter, MaKenna Winters; Teressa Walker; and Teressa's daughter, Kimberly Walker, when the incident occurred. They were all standing close together. While outside, Beavers heard loud vehicle noise

3

and then observed a mint green Geo Tracker being chased by a white Dodge truck coming around the curve. The noise was loud enough to draw her attention to the road. She estimated that the vehicles were traveling 45 or 50 miles per hour when they came around the curve, but they increased their speed on the straightaway. The road in front of the house was partially flooded, and Beavers observed the Tracker move to the left to avoid the deepest water while the Dodge truck passed on the right. After the Dodge truck passed the Tracker, Beavers observed the driver of the Tracker point a gun out of the driver's side window with his left hand and fire twice toward the Walkers' residence. As the two vehicles passed the residence, they were right in front of where Beavers was standing, and she was facing the road and positioned to see the driver's sides of both vehicles. Although Beavers only observed the gun for approximately 30 seconds, she noted that she was familiar with guns, and she was certain that the firearm was either a 9-millimeter or a .22-caliber pistol because she owned both. She was also certain that the sounds that she heard were gunshots.

¶ 9    Beavers, who was angry about the gunshots because someone could have been injured, got into her vehicle and chased after the two vehicles. When she caught up with the defendant and Trammel at a nearby store parking lot, the defendant and Trammel were standing outside their vehicles and arguing. She noted that the defendant was standing outside the Tracker with the vehicle door open, and he had taken off his shirt. She did not see a weapon, and she did not search for a weapon in the Tracker. She confronted the defendant about firing a gun near the residence, and he apologized and said he would never drive by her residence again. At that point, she did not know the defendant's identity, and he would not give his name to her. Beavers then asked Trammel if he knew that the defendant had a gun, and Trammel indicated that he knew. Beavers called Sheriff Suits to report the incident and later provided a written statement. Beavers had observed

4

an individual in the front passenger seat of the Tracker when the vehicles passed the Walkers' residence, but she did not discover the person's identity until later. She did not know Trammel before this incident; she was not related to him and was not friends with him.

¶ 10 On cross-examination, Beavers noted that when she approached the defendant and Trammel in the parking lot, she could "[s]omewhat" see inside the defendant's vehicle and did not see a gun. She estimated that it was not even two minutes between the time that the vehicles passed the Walkers' residence and when she approached the drivers in the parking lot. She noted that she was friends with the Walkers.

¶ 11 Winters testified that she was standing in the Walkers' driveway with Beavers, Teressa, and Kimberly when her attention was drawn to two vehicles traveling on the street. She observed the two vehicles, a green Geo Tracker and a white Dodge truck, coming around the curve at a high rate of speed. She was facing the driver's sides of the vehicles. The Tracker was initially in front, but when the Tracker moved over to the left side of the road to avoid a rain puddle, the Dodge truck passed the Tracker on the right. Winters then saw the driver's side window on the Tracker roll down enough to fit a hand through, saw a hand holding a gun coming out of the window, and heard a gunshot. She acknowledged that she was not familiar with guns, but she had heard gunshots before, and she was sure that she heard a gunshot that day. She could not see who was driving each vehicle, but she saw, through the Tracker's driver side window, that the Tracker's passenger had a long white beard.

¶ 12 On cross-examination, Winters noted that she was standing pretty close to the other three women. The vehicles were in front of the Walkers' residence for approximately 10 to 15 seconds. She noted that the road in that area had several potholes filled with gravel. She clarified that she either heard two gunshots or a gunshot and a "car [backfiring] or something, just another loud

5

noise." However, she was "pretty sure" that she heard one gunshot. She explained that the vehicles were loud because they were going so fast.

¶ 13    Teressa testified that she heard the vehicles speeding up around the curve at the end of her driveway, and she turned toward the road. She then observed the green Geo Tracker moving to the left side of the road, the white Dodge truck passing the Tracker, and both vehicles speeding away. She explained that after she could no longer see the vehicles, she heard "a shot, something [that] sounded like a shot, it wasn't a backfire, it sounded like a shot." She also explained that she heard the vehicles speeding up and then one gunshot. After hearing the gunshot, she quickly walked toward her residence because she was scared. She noted that she had never questioned that the sound that she heard was a gunshot, that she had a little familiarity with guns, and that she had heard gunshots before. She could not see the drivers of either vehicle, and she did not see who had fired the gunshot. She was related to Trammel, and she considered Trammel a friend. However, she did not know that Trammel was driving the white truck until later.

¶ 14    On cross-examination, Teressa noted that the two vehicles were driving over 30 miles per hour. She explained that she heard the noise that she identified as a gunshot about one or two minutes after the two vehicles had driven past her and were no longer within her line of sight. She did not see the vehicles' drivers, and she did not see a gun. She noted that she and the other three women were standing about an arm's width apart, Beavers was right next to her, and there was nothing blocking her line of sight.

¶ 15    Kimberly testified that she was standing outside her parents' house with her mother (Teressa), Beavers, and Winters when she observed the green Geo Tracker and white truck quickly driving around the corner. As the vehicles drove in front of the Walkers' residence, Kimberly saw the white truck pass the Tracker and then she heard a gunshot. She did not see the gun, but she had

some familiarity with guns and had heard gunshots before. She also did not see the drivers of the vehicles because there were trees blocking her line of sight. On cross-examination, Kimberly estimated that the time between when she initially saw the vehicles coming around the corner and when they were outside her line of sight was 30 seconds. She explained that although she did not see a gun, she knew that the noise that she heard was a gunshot. She also heard other noises, such as the vehicles' engines "revving" and water splashing.

¶ 16    Michael Walker, Teressa's husband, testified that he was sitting inside his house at his kitchen bar when his attention was drawn to the window by the sounds of vehicles quickly accelerating and two gunshots. After hearing the gunshots, he looked out the window and saw a white truck being chased by a green Geo Tracker. He had a clear view of the road from that window, but he could not see who was driving each vehicle. He recognized the green Geo Tracker as belonging to the defendant. He then started to go outside but was met at the door by some of the women who were screaming, "they've got a gun." He was very familiar with guns, as well as the sound guns make when fired, and he "[d]efinitely" heard two gunshots that day.

¶ 17    Michael noted that his vision was poor, but he was able to see the vehicles from his position by the window because he was wearing his glasses. However, even with his glasses, Michael could not see the deputy standing at the back of the courtroom. He also could not make an in-court identification of the defendant, noting that he had not seen the defendant in years. Michael noted that Trammel's wife was his cousin, and he did not learn until after the incident that Trammel was driving the white Dodge.

¶ 18    On cross-examination, Michael noted that he was sitting approximately 1 or 1½ feet from the six-foot bay kitchen window that faced the road. Although he noted that the distance from the window to the road was approximately the same distance as to the back of the courtroom, he

7

explained that he could not see the deputy at the back of the courtroom but could see the vehicles because a vehicle was "way larger than a person." He noted that he heard two gunshots. He estimated that it was three seconds between the time that he heard the vehicles and the time when the vehicles passed in front of his house.

¶ 19    Jerry Suits, the Pope County sheriff, testified that on April 15, 2023, both Trammel and Beavers called his cell phone to report shots fired. Trammel reported that the defendant had fired a shot out of the defendant's running vehicle while Trammel was passing the defendant on the right side of the road. Beavers reported that she was a witness to a "shot or two fired" by a driver in a vehicle that had driven by her. For the rest of the day, Sheriff Suits attempted to locate the defendant. At approximately 9 p.m. that evening, Sheriff Suits parked near the defendant's residence to see if the defendant would return home. While waiting outside the defendant's residence, Sheriff Suits heard a vehicle approaching him. He then observed the Geo Tracker with its lights off pass by at a high rate of speed. Sheriff Suits began pursuing the vehicle and was able to pull up beside it and identify the defendant as the driver. However, Sheriff Suits had to terminate the pursuit near the defendant's residence because of the rough terrain.

¶ 20    At approximately 1 p.m. the following day, the defendant came to the Pope County Sheriff's Department and turned himself into police custody. Sheriff Suits never had the opportunity to search the Geo Tracker or to search the defendant before the defendant turned himself in. Sheriff Suits never recovered a firearm from the defendant.

¶ 21    On cross-examination, Sheriff Suits acknowledged that he never recovered any bullets or shell casings from the area where the shots were reportedly fired. He also acknowledged that he did not see any damage that would result from something being struck by a bullet. He never attempted to search the Geo Tracker or the defendant's home, and he did not search the area where

the shots were reported. He also did not conduct any gunshot residue testing or request that the defendant's clothing be tested. On redirect examination, Sheriff Suits explained that he had decided not to conduct any gunshot residue testing because it had been 18 hours since the incident occurred. However, on recross examination, Sheriff Suits acknowledged that he was not a forensic scientist who was trained in gunshot residue testing.

¶ 22    After the State rested its case, Bates, the passenger in the defendant's vehicle on the day in question, testified for the defense. Bates testified that the defendant was his neighbor, and he had known the defendant for approximately 25 years. On the day of the incident, they were driving around drinking beer. Trammel began following behind them because Trammel was mad and wanted to fight. Bates noted that the defendant was trying to outrun Trammel, but Trammel passed them on the right in an area where there was water on the roadway. When Trammel passed them, water splashed into the defendant's vehicle. Bates was afraid that they were going to crash. The defendant continued driving until he saw Trammel parked near the old grocery store. Trammel and the defendant both exited their vehicles, and then a woman came running up to them while yelling, "he's got a gun." Bates did not see the defendant and Trammel arguing or fighting, but he noted that they were behind him. The defendant then got back into the vehicle. Bates was sitting right beside the defendant in the small vehicle and did not see a gun or hear a gun being fired that day. Bates had never seen a gun in the defendant's vehicle. Although the defendant was Bates's friend, Bates would not lie to protect him.

¶ 23    On cross-examination, Bates acknowledged that he started drinking at 7 a.m. that morning, he continued to drink that day, and he was drunk that day. He admitted that the defendant also drank a few beers that day. He estimated that Trammel was driving 40 miles per hour when Trammel passed them. He noted that both Trammel and the defendant were driving recklessly and

9

that there was "road rage going on there." The windows on the Tracker were down. He heard the woman yelling, but he did not look to see who she was. He noted that there was "some yelling going on" between Trammel and the defendant, but he did not know what was being said. Bates did not know whether the defendant had his shirt on. The sheriff came to his house that evening to ask about what occurred and to find the defendant. Bates did not remember telling the sheriff that he was drunk and that the sheriff should talk to him on a different day. The defense rested its case.

¶ 24 The State then recalled Sheriff Suits in rebuttal. Sheriff Suits testified that he had attempted to interview Bates on the evening of April 15, but when Sheriff Suits asked Bates about a gun being fired, Bates indicated that he was drunk and that it might be better to talk to him the following day. Sheriff Suits then interviewed Bates on April 17, and during this interview, Bates said that he did not see the defendant with a gun and did not hear any gunshots.

¶ 25 Following closing arguments and jury deliberations, the jury found the defendant guilty of UPWF. Thereafter, on March 1, 2024, the trial court sentenced the defendant to 10 years in prison. The defendant then filed a timely notice of appeal.

¶ 26                                     II. ANALYSIS

¶ 27                              1. *Sufficiency of the Evidence*

¶ 28 The defendant's first argument is that the State failed to prove him guilty beyond a reasonable doubt of UPWF where there was no physical evidence establishing that he committed the offense and where the State relied on inconsistent and biased witness testimony. Due process requires the State to prove each element of a criminal offense beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). When a defendant challenges his conviction based upon the sufficiency of the evidence, the relevant question is whether, after viewing the evidence

10

in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 29 This standard recognizes the responsibility of the trier of fact to determine the credibility of the witnesses and the weight to give their testimony, to resolve any conflicts and inconsistencies in the evidence, and to draw reasonable inferences from such evidence. *People v. McLaurin*, 2020 IL 124563, ¶ 22; *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). A reviewing court must allow all reasonable inferences from the record in favor of the prosecution, and will not overturn the decision of the trier of fact unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *People v. Parrott*, 2017 IL App (3d) 150545, ¶ 26. The reviewing court will not retry a defendant on appeal, nor will the reviewing court substitute its judgment for that of the trier of fact. *McLaurin*, 2020 IL 124563, ¶ 22. Where the finding of guilt depends on eyewitness testimony, a reviewing court must decide whether, in light of the record, a fact finder could reasonably accept the testimony as true beyond a reasonable doubt. *Cunningham*, 212 Ill. 2d at 279.

¶ 30 In order to sustain a conviction of UPWF, the State must prove that defendant (1) knowingly possessed a firearm and (2) had previously been convicted of a felony. 720 ILCS 5/24-1.1(a) (West 2022). Given that the defendant stipulated to having been previously convicted of a felony offense, the defendant does not challenge the sufficiency of the evidence to prove the second element. Therefore, we restrict our analysis to whether the defendant knowingly possessed a firearm.

¶ 31 In this case, the defendant contends that the State did not present any physical evidence to show that he possessed a firearm on April 15, 2023, as the police did not recover a firearm, bullets, or shell casings, or find any evidence of damage or bullet holes from the gun firing. While the

11

defendant is correct that there was no physical evidence establishing that he knowingly possessed a firearm on the date in question, we note that the defendant fled from Sheriff Suits the night of the incident. Therefore, Sheriff Suits never had an opportunity to search the defendant or the defendant's vehicle before the defendant turned himself into police custody the day after the incident. Also, there was consistent testimony from two eyewitnesses (Beavers and Winters) who observed the defendant point a gun out of his vehicle's window and fire it while driving by the Walkers' residence. Beavers, who was positioned to see the driver's side of the defendant's vehicle, observed the defendant point a gun out the driver's side window with his left hand and fire it twice toward the Walkers' residence. Although Beavers only observed the gun for approximately 30 seconds, she was familiar with firearms and was able to identify the firearm as either a 9-millimeter or a .22-caliber pistol. She also had no doubt that the sounds that she heard were gunshots. Immediately after the incident, she confronted the defendant about firing the gun near the residence, and he apologized. This testimony was corroborated by Bates's testimony that a woman approached Trammel and the defendant in the nearby parking lot and was yelling, "he's got a gun."

¶ 32    In addition, Winters, who was also positioned to see the driver's sides of the passing vehicles, corroborated Beavers's account that the defendant held a gun outside his vehicle's window and discharged it as he passed by the Walkers' residence. Although Winters was not familiar with guns, she had heard gunshots before, and she was sure that she heard at least one gunshot that day. Thus, while both Beavers and Winters only saw the gun for a brief period of time as the vehicles quickly passed by them, they both unequivocally testified that they saw the defendant with a gun that day.

12

¶ 33    Moreover, there were other witnesses who testified that they heard one or two gunshots during the incident. Specifically, both Teressa and Kimberly testified that although they did not see a gun, they heard a gunshot. Michael also testified that he "definitely" heard two gunshots that day. Trammel, who was familiar with firearms, testified that he had no doubt that the sound that he heard was a gunshot. Thus, this testimony provided further support to Beavers's and Winters's accounts of seeing the defendant fire a gun that day.

¶ 34    In arguing that the above evidence was insufficient to convict the defendant of UPWF, the defendant points to the inconsistencies in the various witnesses' testimony. In particular, the defendant notes that even though Teressa and Kimberly were standing right next to the other women, they never saw the defendant with a gun. Also, the defendant notes that while Beavers and Michael were adamant that they heard two gunshots, the other witnesses only mentioned that they heard one gunshot. Further, the defendant notes that many of the witnesses also testified about all the other loud noises that were going on at the time that they allegedly heard gunshots, such as the sounds of the vehicles' engines and the water splashing from the potholes in the road. In addition to pointing to the inconsistencies in the testimony, the defendant also contends that the State's witnesses had a clear bias against the defendant. The defendant notes that Trammel did not like the defendant and wanted to get the defendant in trouble, that Trammel was related to three of the testifying witnesses, and that the other witnesses were friends with the Walkers. Thus, the defendant questions their credibility.

¶ 35    While minor inconsistencies existed in the witnesses' testimony, their accounts of what occurred on the day in question were consistent in all crucial respects. After hearing the witnesses' testimony, viewing them while testifying, and being made aware by defense counsel of the alleged deficiencies in the testimony, the trier of fact found the defendant guilty of UPWF. Whether minor

13

inconsistencies in testimony irreparably undermined the credibility of the State's witnesses is a matter for the trier of fact to decide. *People v. Howard*, 376 Ill. App. 3d 322, 329 (2007). Also, we note that the issue of witness bias was thoroughly explored during defense counsel's cross-examination of the various witnesses. The question of the credibility of these witnesses is a question best suited for the fact finder. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). This court will not substitute its judgment for that of the trier of fact on these matters unless the proof is so unsatisfactory that a reasonable doubt of guilt appears. *Cunningham*, 212 Ill. 2d at 279-80. Taking the evidence in the light most favorable to the State, a rational fact finder could find, beyond a reasonable doubt, that the defendant knowingly possessed a firearm on the day in question. Thus, despite the variances in the testimony or the alleged bias of the witnesses, we find that the State's evidence was sufficient to support a finding that the defendant was guilty beyond a reasonable doubt of UPWF.

¶ 36                                    2. *Constitutionality of the UPWF Statute*

¶ 37    The defendant next contends, for the first time on appeal, that the UPWF statute violates his second amendment right under the United States Constitution (U.S. Const., amend. II), both facially and as applied to him. Generally, issues raised for the first time on appeal are forfeited. See *People v. Brooks*, 2023 IL App (1st) 200435, ¶¶ 56-57; *People v. McCarty*, 223 Ill. 2d 109, 122 (2006). However, a facial challenge to the constitutionality of a statute may be raised at any time, including for the first time on appeal. *People v. Baker*, 2023 IL App (1st) 220328, ¶ 35. In addition, an as-applied challenge may be raised for the first time on appeal, as long as the record is sufficiently developed to permit the reviewing court to fully analyze the claim. *Brooks*, 2023 IL App (1st) 200435, ¶ 57.

14

¶ 38     To succeed in facially challenging a statute as unconstitutional, the defendant must show that the statute is unconstitutional under any set of facts. *People v. Kelley*, 2024 IL App (1st) 230569, ¶ 12. A defendant's particular circumstances are irrelevant. *Baker*, 2023 IL App (1st) 220328, ¶ 34. In contrast, an as-applied challenge requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the challenging party. *Brooks*, 2023 IL App (1st) 200435, ¶ 57.

¶ 39     All statutes carry a strong presumption of constitutionality, and the party challenging the constitutionality of a statute carries the burden of proving that the statute is unconstitutional. *People v. Mosley*, 2015 IL 115872, ¶ 22. Moreover, this court has a duty to construe the statute in a manner that upholds the statute's validity and constitutionality whenever reasonably possible. *Kelley*, 2024 IL App (1st) 230569, ¶ 12. The constitutionality of a statute is a question of law that we review *de novo*. *People v. Smith*, 2025 IL App (5th) 230656, ¶ 12.

¶ 40     First, we will consider the defendant's facial challenge to the UPWF statute. The second amendment of the United States Constitution provides as follows: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. The United States Supreme Court held that the fourteenth amendment (U.S. Const., amend. XIV) requires the states to regulate firearms in accordance with second amendment protections. *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). Also, the Court has recognized that the second and fourteenth amendments protect the right of an ordinary, law-abiding citizen to possess a handgun inside and outside the home for self-defense. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 8-10 (2022).

¶ 41     In *Bruen*, the Court developed the following two-part analysis for evaluating second amendment claims:

15

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id.* at 24.

Illinois courts have concluded that "the two-part process requires us to determine (1) whether defendant's conduct falls within the plain text of the second amendment and, if so, (2) whether there is a justification for the regulation rooted in history and tradition." *People v. Travis*, 2024 IL App (3d) 230113, ¶ 24.

¶ 42 Applying the first part of the *Bruen* analysis, the defendant here contends that the second amendment protects his conduct despite his status as a felon because the second amendment's plain language covers "the people" and not only law-abiding citizens. However, we note that different panels of this court have disagreed about whether felons fall within the scope of the second amendment. In *People v. Stephens*, 2024 IL App (5th) 220828, ¶ 1, this court considered whether a facial second amendment challenge applied to the unlawful use of a weapon by a felon statute (720 ILCS 5/24-1.1(a) (West 2022)), the same statute at issue here. In that case, the court followed the reasoning in *United States v. Ware*, 673 F. Supp. 3d 947, 956 (S.D. Ill. 2023), and concluded that defendant fell into the category of "the people" protected by the second amendment, regardless of defendant's status as a felon. *Stephens*, 2024 IL App (5th) 220828, ¶ 33. However, the *Stephens* court found that defendant's status as a felon was more properly evaluated under the second prong of the *Bruen* analysis. *Id.* ¶ 34. The court then ultimately found that the unlawful use of a weapon by a felon statute was constitutional on its face where the State met its burden of

16

showing that the statute is consistent with this nation's historical tradition of firearm regulation. *Id.* ¶ 39.

¶ 43  In contrast, in *Smith*, 2025 IL App (5th) 230656, ¶ 25, a different panel of this court concluded that the federal and appellate court decisions that held that felons were not protected under the second amendment's plain language were better reasoned decisions. In *Smith*, the defendant argued that the armed violence statute (720 ILCS 5/33A-2(a) (West 2022)) violated his second amendment right to carry a handgun for self-defense, both facially and as applied to him. *Smith*, 2025 IL App (5th) 230656, ¶ 1. Departing from the reasoning of *Stephens*, the *Smith* court found that a defendant who was in the process of committing a felony while simultaneously possessing an operational firearm does not fall into the category of "the people" protected by the second amendment. *Id.* ¶ 25. In support of its conclusion that felons are not protected by the plain language of the second amendment, the *Smith* court recognized the various decisions that had found that the repeated references to the phrase "law abiding" in *Bruen* strongly suggested that the *Bruen* analysis only applied when a regulation impacted a law-abiding citizen's ability to keep and bear arms. *Id.* ¶¶ 22, 25.

¶ 44  After conducting a thorough analysis of the various decisions on the issue, we respectfully disagree with *Stephen*'s approach and follow our decision in *Smith*. Our conclusion here is consistent with other Fifth District decisions that have been issued since *Smith*. See *People v. Ferrell*, 2026 IL App (5th) 250371-U, ¶ 17; *People v. Hudson*, 2025 IL App (5th) 231140-U, ¶¶ 19-20; *People v. Martin*, 2025 IL App (5th) 231086-U, ¶¶ 21-22; *People v. Gordon*, 2025 IL App (5th) 240359-U, ¶¶ 21-22; *People v. Williams*, 2026 IL App (5th) 231356-U, ¶¶ 42-43.

¶ 45  In this case, the defendant was convicted of UPWF. The UPWF statute makes it unlawful for a person, who has been convicted of a felony, to knowingly possess a firearm. 720 ILCS 5/24-

17

1.1 (West 2022). The defendant stipulated, at trial, that he was previously convicted of a felony. As such, the defendant is not a law-abiding citizen, and, per our reasoning in *Smith*, is thus not protected by the second amendment. Because we determined that the defendant is not a law-abiding citizen who is protected under the second amendment, we need not address the second step of the *Bruen* analysis.

¶ 46    We now turn to the defendant's as-applied constitutional challenge. The defendant acknowledges that he has three prior felony convictions: a 2014 conviction for driving while his driver's license was revoked, a 2008 conviction for unlawful use of a weapon by a felon, and a 2003 conviction for intimidation by inflicting physical harm. However, he argues that there is no historical analogue that would constitutionally permit the restriction of firearm possession based on nonviolent felony convictions that were over 10 years old and on a violent felony conviction that was almost 22 years old.

¶ 47    Although the defendant did not raise his as-applied challenge before the trial court, the record is sufficient for this court to review his claim, especially where the record includes the current UPWF conviction and the defendant's criminal history. The State seemingly concedes this point, as it does not argue that the record is insufficient to review the claim. Thus, we will consider the defendant's claim. In *Baker*, 2023 IL App (1st) 220328, ¶ 2, our colleagues in the First District considered a defendant's as-applied constitutional challenge to the unlawful use of a weapon by a felon statute, the same statute at issue in this case. In that case, the court found that *Bruen* did not apply to a defendant who had been previously convicted of a felony because the *Bruen* Court could not have been "more clear that its newly announced test applied only to laws that attempted to regulate the gun possession of 'law-abiding citizens,' and not felons like defendant." *Id.* ¶ 37.

Thus, the court found that defendant was "outside the box drawn by *Bruen*," and that the statute was not unconstitutional as applied to him. *Id.* ¶¶ 37-41.

¶ 48 Moreover, challenges seeking to create a distinction between being a violent felon and a nonviolent felon for the purposes of *Bruen* and the second amendment have been rejected. See *People v. Lopez*, 2025 IL App (1st) 232120, ¶ 26. For example, in *People v. Travis*, 2024 IL App (3d) 230113, ¶ 37, the court found that the armed habitual criminal and unlawful use of a weapon by a felon statutes were constitutional as applied to defendant, irrespective of the violent or nonviolent nature of his convictions. Also, in *Brooks*, 2023 IL App (1st) 200435, ¶ 100, the armed habitual criminal statute was upheld as constitutional, as applied to a defendant with prior nonviolent felonies because he was "not a law-abiding citizen." Thus, we likewise find that the UPWF statute is constitutional, as applied to the defendant, irrespective of the violent or nonviolent nature of his convictions as well as the age of those prior felony convictions. Accordingly, we find that the defendant's challenges fail both facially and as applied to him.

¶ 49                                  III. CONCLUSION

¶ 50 For the above reasons, we affirm the judgment of the circuit court of Pope County.


¶ 51 Affirmed.

19